**J.C. FLATFORD, et al., Plaintiffs–Appellees,**

v.

**CITY OF MONROE, et al., Defendants,**

Michael Bosanac, also known as Director of Building and Safety, individually and in his official capacity as Director of Building, Zoning and Environmental Development; Thomas Moore, Officer; David Foley, Officer; Charles Abel, Offi-

cer, Monroe City Police Officers; One Unknown Female Monroe City Police Officer; One Unknown Male Monroe City Police Officer, individually and in their official capacities, Defendants–Appellants.

No. 92–2004.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1993.

Decided Feb. 22, 1994.

Douglas R. Mullkoff, Ann Arbor, MI (briefed), Robert F. Gillett (argued), Legal Services of Southeastern Michigan, Inc., Ann Arbor, MI (argued), John D. Erdevi (briefed), Monroe, MI (briefed), for plaintiffs-appellees.

Robert G. Kamenec, Plunkett & Cooney, Detroit, MI (argued and briefed), for defendants-appellants.

Before: NORRIS and SILER, Circuit Judges; and HEYBURN, District Judge.*

HEYBURN, District Judge.

Plaintiffs–Appellees, the Flatford family, brought this civil rights action under 42 U.S.C. § 1983 alleging that city officials evicted them from their apartment without procedural due process guaranteed under the Fourteenth Amendment and in violation of their Fourth Amendment right against unreasonable seizures. Defendants–Appellants, including several city police officers and a city building inspector, appeal the district court's order denying their motions for summary judgment on the basis of qualified immunity. 794 F.Supp. 227.

This case raises difficult questions regarding what process is due when our government evicts its citizens from their homes in

* The Honorable John G. Heyburn II, United States District Judge for the Western District of Kentucky, sitting by designation.

an emergency and the allowance we should give public officials for any misjudgment of the circumstances. We conclude, first, that although the city building inspector is entitled to qualified immunity for any failure to provide predeprivation process, he is not qualifiedly immune for his failure to provide postdeprivation process; and, second, that the police officers are entitled to qualified immunity on all claims. For the reasons set forth herein, we will affirm in part, reverse in part, and remand.

## I.

The circumstances in this case began when, on a Friday before the Memorial Day weekend of 1990, city police officers reported unsafe conditions at a multi-unit apartment building in the City of Monroe, Michigan to the City's Director of Building and Safety, Michael Bosanac. The officers had entered the building pursuant to a search warrant in an investigation unrelated to the Flatfords, a low-income family of six, including four small children. Bosanac obtained an administrative inspection warrant the next morning and inspected the premises that day, Saturday, May 26, 1990, while accompanied by a city attorney.

Bosanac found numerous building code violations throughout the eighty-year old, wooden-framed structure ranging from structural failure and extensive "wood-rot" to exposed electrical wiring and the presence of combustibles. (Ex. 3, First Amended Complaint.) Bosanac testified that the extensive degree of dilapidation and disrepair was among the worst he had seen and feared that its tenants, including seven adults and sixteen children, faced an immediate risk of electrocution or fire. Because in his judgment hazardous conditions posed an emergency situation, Bosanac conferred with the city attorney, posted condemnation signs on all entrances and, with the assistance of city police officers, David Foley, Charles Abel and Thomas Moore, ordered the building vacated within two and a half hours.

Over the holiday weekend, evacuees were allowed to collect additional belongings only with police escort due to condemnation notices posted on the premises which read, "It is unlawful for any person to occupy or reside in this building." (First Amended Complaint ¶ 31.) Three other inspectors conducted a thorough inspection immediately after Memorial Day on Tuesday, May 29, 1990 and detailed an expansive list of code deficiencies. Apparently, four units were accountable for the most significant violations while the Flatfords' apartment, the only unit on the upper floor, merely required minor repairs, the more serious being a missing electrical switch plate and an inoperative smoke detector.

Bosanac notified, pursuant to state procedure[1], the Flatfords' landlord, Judy Molenda, of the inspection results, as well as the actions necessary to bring the structure into compliance and the right to an administrative appeal. The Flatfords, however, remained dispossessed from their home for thirteen days without any judicial review of the emergency order to evacuate. Although the other four units remained unauthorized for occupancy, Bosanac permitted the Flatfords' reoccupancy after installing an operative smoke detector in their apartment and disconnecting the other tenants' utilities services.

This § 1983 action ensued, and city officials moved for summary judgment on the basis of qualified immunity while the Flatfords moved for summary judgment on the federal claims. The district court reasoned that because the only basis for evicting the Flatfords from their unit was an inoperative smoke detector, no emergency existed. The court then held, based on those facts, that the denial of a predeprivation hearing violated the Flatfords' due process rights, thus warranting summary judgment on the due process claim. On the immunity issue, the court held that because a reasonable official would have known that evicting the Flatfords without any sort of hearing violated their constitutional rights, neither Bosanac nor the police officers were entitled to qualified immunity.[2] The city officials take this interlocutory appeal of the district court's denial of qualified immunity.

**II.**

▮ The doctrine of qualified immunity shields government officials performing discretionary functions from civil damages liability as long as their actions are reasonable in light of the legal rules that were clearly established at the time of their conduct. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Although the reasonableness of an official's action turns on objective factors, the Supreme Court requires a fact-specific inquiry to determine whether officials would reasonably, even if mistakenly, believe their actions are lawful. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). To withstand a motion for summary judgment on the ground of qualified immunity, the plaintiff must establish: (1) an alleged violation which implicates clearly established law, and (2) facts sufficient to create a genuine issue that the alleged violation of that law actually occurred. *Russo v. City of Cincinnati,* 953 F.2d 1036, 1043 (6th Cir.1992).

▮ Notwithstanding these outwardly clear statements, the difficulty for all judges with qualified immunity has not been articulation of the rule, but rather the application of it. As Justice Holmes once said, "General propositions do not decide concrete cases.

---

1. The City of Monroe building code requires a building official to commence proceedings upon a determination that a building is dangerous by serving "notice and order" to the owner, its occupants, and others holding record or known legal interest in the premises. Monroe, Mich., Ordinance No. 89–018, § 1 adopting by reference Unif.Bldg.Code § 401 (1988). This notice and order sets forth descriptions of the property and its dangerous conditions, the action required for compliance with the building safety code, and any consequences for failure to comply, e.g., demolition or government repair with assessment of costs. More significantly, the notice and order advises of the right to an administrative hearing by filing an appeal with the building official within thirty days.

2. The court below has yet to decide whether the City of Monroe has any liability under *Monell v. Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), for an established policy or course of dealing which systematically denied Plaintiffs their due process rights.

The decision will depend on a judgment or intuition more subtle than any articulate major premise." [3] Thus, we must settle whether the Flatfords' version of the facts proves that Defendants did not act reasonably. *Russo*, 953 F.2d at 1043. This is an issue of law that we review de novo.

### III.

We will first address whether Bosanac is entitled to qualified immunity. Clearly, the Constitution requires some process incident to a taking of property at a meaningful time, which depending on the competing interests involved may either be before or after the deprivation. *Zinermon v. Burch*, 494 U.S. 113, 136, 110 S.Ct. 975, 989, 108 L.Ed.2d 100 (1990). Aside from only minimal notice to evacuate, Bosanac provided the Flatfords with no due process. We must, therefore, determine whether Bosanac is qualifiedly immune for his failure to provide the Flatfords any process before or after the eviction.

### A. Predeprivation Process

 In *Fuentes v. Shevin*, the Supreme Court held that due process requires notice and a hearing prior to eviction. 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). There are, however, "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after [eviction]." *Id.* at 82, 92 S.Ct. at 82. A prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a government official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance. *Id.* at 91, 92 S.Ct. at 2000. In this case, the Monroe City Ordinance provides, "If the building or structure is in such condition as to make it immediately dangerous to the life, limb, property or safety of the public or its occupants, it shall be ordered to be vacated." Monroe, Mich., Ordinance No. 89–018, § 1 adopting by reference Unif.Bldg.

Code § 403(2) (1988). Protecting citizens from an immediate risk of serious bodily harm falls squarely within those "extraordinary situations" contemplated in *Fuentes*. The Flatfords therefore have a clearly established right to a pre-eviction hearing only in the absence of exigent circumstances.

 The Flatfords argue that the district court was correct to conclude in their favor that no exigent circumstances supported their peremptory eviction since, drawing all inferences in their favor, their unit alone did not contain immediately dangerous conditions other than an inoperative smoke detector. We must respectfully disagree with the limited scope of the district court's analysis and, therefore, with its conclusions. To determine whether Bosanac exercised reasonable judgment, we must examine the Flatfords' evidence concerning the condition of the structure as a whole, not merely the condition of the Flatford's unit in isolation of the units directly below. No one can seriously suggest that where there is a reasonably significant risk of fire, the installation of a smoke detector alone would guarantee the safety of children in adjacent apartments. Sometimes children are left alone. Dangerous conditions do not limit their consequences to the walls of a particular apartment. As a result, it was eminently reasonable for Bosanac to consider that the Flatfords' safety required more than the mere installation of a smoke detector in one apartment.

The dispositive issue, therefore, is whether Bosanac's conclusion that an emergency situation existed was an objectively unreasonable decision in light of the information he then possessed, construing the evidence in a light most favorable to the Flatfords. The owner of the premises, Judy Molenda, specifically disputed the seriousness of conditions noted in Bosanac's report.[4] She states by affidavit that exterminators visited monthly; that at least one of the two supposedly dangerous exterior walls revealed no structural failure; that the other questionable wall could have

---

**3.** *Lochner v. New York*, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).

**4.** Bosanac served the Flatfords' landlord with a six-page "notice and order" pursuant to § 401 of the Uniform Building Code, *supra*, n. 1.

been corrected within "a few days"; that a splice in a wall switch could have been immediately corrected by shutting off the separately metered electric service to that apartment and disconnecting the illegal splice; that an extension cord running in the hall between two units could have been removed; that there was no storage in the stairway of combustible materials—no gasoline, oil, or the like—only household products stored in one unit in proximity to frayed electrical wiring; and finally that the roof did not leak. In essence, Molenda's affidavit does not dispute the existence of the conditions, but merely questions Bosanac's judgment concerning the degree of seriousness.

■ Qualified immunity is a creation of policy designed to strike a balance that allows compensation for persons who suffer injury caused by lawless conduct but avoids over-deterring officials where their duties legitimately require action in situations not implicating clearly established rights. *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738–39. An emergency eviction from one's home is a significant intrusion. However, where the need to protect lives is the basis for such an intrusion, government officials should not be made to hesitate in performing their duties, particularly where postdeprivation remedies can immediately correct any errors in judgment.[5] There can be no doubt that Bosanac's judgment which we now so thoroughly second guess falls squarely within the scope of his most important duties, that is to protect those who are endangered and unable to protect themselves from a landlord's neglect.

The record clearly contains facts from which a reasonable building inspector could conclude that the occupants, and particularly the children, might be imminently endangered. Even if in hindsight we conclude that Bosanac's decision to evacuate was erroneous, the Flatfords' evidence fails to prove that a reasonable building inspector could not conclude that the condition of the wooden-framed structure posed an immediate threat to the safety of its occupants. We, therefore, hold that Bosanac is entitled to qualified immunity for any failure to provide predeprivation process. However, this does not re-

solve the case finally in his favor, for the problem here is Bosanac's complete failure to provide any process which is so essential where there is significant risk of government error.

## B. Postdeprivation Process

■ The Flatfords contend that assuming arguendo the perceived dangerousness of the building justified Bosanac's actions, he made no effort to justify the denial of post-eviction process. Not all claims for the denial of postdeprivation process, however, are cognizable under § 1983. A citizen has no § 1983 cause of action, for instance, where state tort law furnishes all appropriate process, or where the deprivation cannot be predicted. In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), a prisoner sued a state employee who negligently lost materials the prisoner had ordered by mail. Although the prisoner had suffered a deprivation of property within the meaning of the Fourteenth Amendment, the Supreme Court held that all the process due for such random, unauthorized conduct was provided under state tort law. In *Zinermon v. Burch*, 494 U.S. 113, 136, 110 S.Ct. 975, 989, 108 L.Ed.2d 100 (1990), the Supreme Court declined to extend the "random and unauthorized conduct" standard to situations where a deprivation is predictable. Certainly, emergency evacuations, as here, are not so rare that city officials cannot prepare for advising emergency evacuees of their right to an administrative hearing as similarly provided to landlords.

■ The *Parratt* limitation is inapplicable in this case on the basis of a more fundamental distinction. The *Zinermon* Court stated that *Parratt* represents a "special case of the general *Mathews v. Eldridge* analysis, in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide." *Zinermon* at 128, 110 S.Ct. at 985. In a situation such as this, however, the state could be expected to provide more. The Due Process Clause requires truly remedial process at a meaningful

---

5. See subsection B of this opinion.

time, which is determined by balancing the competing interests involved. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Among those factors considered are the risk of government error, the importance of the protected interest, the length or finality of the deprivation, and the magnitude of the government interest. *Id.* at 335, 96 S.Ct. at 903. Here, postdeprivation state tort remedies are neither timely nor sufficiently remedial for emergency evacuees. Fundamental fairness expects more of a state than mere tort remedies where government dispossesses its citizens from their homes.

▆▆▆ Because in many cases emergency evacuees may determine there is no need for administrative review, we cannot say that an automatic hearing is constitutionally required. However, fundamental fairness requires notice in short order of the right to an administrative hearing, including the manner designated for obtaining timely review.[6] The requirement of an immediate and meaningful postdeprivation process becomes even more important in view of the license which qualified immunity essentially allows public officials when they make judgments affecting the health and safety of our citizens under perceived exigent circumstances. Even though we recognize that these judgments may be mistaken, the opportunity of an administrative hearing assures that fairness will quickly prevail and that constitutional rights, if mistakenly curtailed, will be immediately restored. Without the assurance of immediate review, qualified immunity may be wrongly perceived as an open invitation for public officials to ignore fundamental rights without any fear of censure. This is most certainly not our intended message.

▆▆▆ The issue remains whether the contours of the Flatfords' rights were sufficiently clear that a reasonable official would understand that what he is doing violates that right. The record below indicates that Bosanac advised the landlord of the right to a hearing and that the Flatfords were in contact with Bosanac's office while residing in limbo. Yet despite actual knowledge of the Flatfords' possessory interests, Bosanac took no action on their behalf. It is too plain for argument that the Flatfords, who were barred from entering their home, have at least a clearly-established right to process of the sort that Bosanac afforded to their landlord. We hold that Bosanac's actions were objectively unreasonable, and therefore affirm the district court's denial of qualified immunity on these grounds.[7]

### IV.

▆▆▆ The remaining issue is whether the police officers are entitled to qualified immunity. On appeal, the Flatfords advance a Fourth Amendment challenge to the officers' assistance in effectuating the eviction without a warrant or other court order. The Fourth Amendment, made applicable to the States by the Fourteenth, guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment not only protects criminal suspects but also limits governmental intrusions in civil contexts. *See Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 539, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967) (holding that Fourth Amendment applicable in administrative searches for safety inspections). Whether officers should be immune from

6. It is of no consequence that notifying the Flatfords would have been more cumbersome than notifying the owner of record, as was done in this case. The practical difficulties of notifying persons dispossessed of their home, although reason for some delay, does not justify the failure to ever advise them of how they may obtain an administrative hearing.

7. The Seventh Circuit reached a different conclusion in *McGee v. Bauer*, 956 F.2d 730 (7th Cir. 1992), where a homeowner was dispossessed of his home under perceived exigent circumstances.

Although troubled by the building inspector's failure to advise the plaintiff of his right to a hearing, the court reasoned that the inspector's omission was not unreasonable since it was not his but a city attorney's duty to advise the plaintiff of his legal rights. This case, however, is distinguishable by the fact that Bosanac is not merely a building inspector but the highest official of the City's Building Safety Department, vested with the statutory duties of commencing proceedings against those responsible for dangerous structures.

damages for an alleged Fourth Amendment violation is a fact-specific inquiry: the contours of the Flatfords' rights against unreasonable seizure must have been sufficiently clear that a reasonable officer would understand that what he is doing violates the Fourth Amendment. *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

In this case, it was sufficiently clear at the time of the eviction that the Flatfords were entitled to pre-eviction judicial oversight in the absence of emergency circumstances. It is of no consequence that the Supreme Court did not clarify that one source of this constitutional right is the Fourth Amendment. *See Soldal v. Cook County, Ill.,* —— U.S. ——, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992).[8] Here, the Fourth Amendment standard of reasonableness requires no more of government officials than that of due process of law. *Id.* —— U.S. at ——, 113 S.Ct. at 549, *citing Camara*, 387 U.S. at 539, 87 S.Ct. at 1736 *and Fuentes*, 407 U.S. at 67, 92 S.Ct. at 1983. Both constitutional provisions recognize an exigency exception, *United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), and, thus, lead to no practical distinction in this case.

■ Whether the officers violated the Fourth Amendment or whether exigent circumstances in fact justified the warrantless eviction, however, does not resolve the issue of qualified immunity. In *Anderson v. Creighton*, the Supreme Court cautioned that law enforcement officers whose judgments in

making difficult determinations are objectively, legally reasonable should not be held personally liable in damages for conduct which, under Fourth Amendment academics, constitute a violation. 483 U.S. at 643–44, 107 S.Ct. at 3040–41. The Court stated:

> We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable. The same is true of their conclusions regarding exigent circumstances.

*Id.* at 641, 107 S.Ct. at 3039 (citation omitted).

■ The very point of the exigency exception under these circumstances is to allow immediate effective action necessary to protect the safety of occupants, neighbors, and the public at large. Although police officers may have some knowledge of what constitutes a "dangerous building" as defined under municipal building codes, requiring officers to second guess the more informed judgment of a building safety inspector would hinder effective and swift action. Officers should, therefore, have wide latitude to rely on a building-safety official's expertise where that expert determination appears to have some basis in fact.[9]

Given the extensive disrepair and dilapidation of the wooden-framed structure as a

8. While the Court was not creating new substantive Fourth Amendment law, it stated in no uncertain terms that the right against unreasonable seizures is "transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all." *Soldal,* —— U.S. at ——, 113 S.Ct. at 548.

9. This case is one in which officers faced some indicia of an emergency. We are not prepared to say, however, that such indicia are predicate to an officer's reliance upon an inspector's decision to evacuate. Given the need for swift action once an inspector has determined that conditions pose an immediate hazard, officers have no duty to test whether the decision has any basis in fact, e.g., that there is exposed wiring, electric splices,

etc. Qualified immunity should ordinarily apply in these situations even where officers are unaware of the precise conditions that an inspector concludes, in his judgment, constitutes an immediate hazard. This immunity, however, remains qualified. If there are suspicious circumstances which would lead a reasonable officer to scrutinize whether an inspector's actions are wholly arbitrary, then reliance upon the inspector's judgment should not shield officers who act unreasonably. Similarly, officers should not be immune if there is affirmative evidence that officers actually knew that the city official was not a building inspector, that the building inspector was fabricating a story, or that the eviction targeted the wrong address. Simply stated, reasonable officers should not hesitate in effectuating an emergency order to evacuate.

whole, we hold that the officers had a reasonable basis for believing Bosanac's determination that conditions posed an immediate danger to its occupants and the public. Nothing in the record suggests that the officers did more than that minimally necessary to effectuate Bosanac's order. We, therefore, reverse the district court's ruling on this issue and hold that the officers are entitled to qualified immunity.

The district court's order denying qualified immunity is, therefore, affirmed in part, reversed in part, and remanded.