Bonnie SELL;  Natalie Cuckler,
Plaintiffs–Appellants,

v.

CITY OF COLUMBUS, et al.,
Defendants–Appellees.

No. 00–4467.

United States Court of Appeals,
Sixth Circuit.

Aug. 26, 2002.

Before CLAY and SILER, Circuit Judges; and OBERDORFER, District Judge.*

## OPINION

OBERDORFER, District Judge.

On December 3, 1998, John Cross, a Code Enforcement Officer with the Columbus, Ohio Department of Trade and Development, summarily evicted plaintiff-appellants sixty-five year old Bonnie Sell, and her eighty-three year old mother, Natalie Cuckler, from their two-bedroom home without a pre-eviction hearing. As the basis for the eviction, Cross cited unsanitary conditions caused by thirty-three dogs kept in and around the home. Plaintiff-appellants subsequently sued the City and several individuals, including Cross, alleging that their eviction without a pre-deprivation hearing violated 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments. The parties filed cross-motions for summary judgment; on October 30, 2000, the district court granted defendants' motion and denied plaintiffs' motion.

■ Plaintiff-appellants raise three meritorious issues on appeal: that the district court erred in holding that (1) Code Enforcement Officers are authorized by statute to issue immediate vacate orders without a hearing and therefore the City of Columbus did not violate plaintiffs' constitutional rights through a policy and practice of allowing them to do so; (2) Columbus is not liable for failure to train its Code Enforcement Officers; and (3) the Code Enforcement Officers are entitled to

qualified immunity.[1] All of these contentions raise pertinent factual issues. Because the district court erred in granting summary judgment in the face of disputed issues of material fact, we **REVERSE** and **REMAND** for further proceedings.

## I. BACKGROUND

As of December 3, 1998, plaintiffs kept twenty-one of the thirty-three dogs inside; they housed an additional twelve in kennels inside the backyard. At any one time, six of the "inside" dogs were kept in cages, with fifteen loose in the house.

On November 20, 1998, the Public Health Veterinarian for Columbus, Dr. Robert Lautzenheiser, the sanitarian for the Columbus Health Department, Cal Collins, and a representative from Animal Rescue, Barbara Penn, visited the home. Dr. Lautzenheiser examined each of the dogs, and determined that all of them were in good physical condition, except for three older dogs whose chronic health problems were being treated with appropriate medication. On the occasion of his visit, the veterinarian found the house to be relatively clean. It had "a distinct odor that animals were definitely in there." Joint Appendix ("J.A.") at 54. However, he did not "find any bowel movement or droppings or anything like that on the floor." *Id.* In particular, Dr. Lautzenheiser did not find that the number of dogs posed "an imminent health risk," to either the canine or human occupants. *Id.* He testified that in the two-week interval between his visit

---

* The Honorable Louis F. Oberdorfer, United States District Judge for the District of Columbia, sitting by designation.

1. Although this issue is tangential to the merits of the appeal, we affirm the district court's decision to admit evidence, in the form of photographs of the home, appended to defendants' reply brief in support of its motion for summary judgment. Evidence may be submitted with a reply brief to "rebut the positions argued in memoranda in opposition." S.D. Ohio Local Rule 7.2(e). Defendants submitted the photographs as a rebuttal to a photograph Sell attached to her opposition brief, purporting to show conditions in the house on December 3, 1998.

and the eviction on December 3, 1998 there could have been an accumulation of animal waste from thirty-three dogs that, if not properly disposed of, could pose "an imminent and serious risk to the health of the residents." *Id.*

On the morning of December 3, 1998, Code Enforcement Officer Cross arrived outside the Sell home to investigate a complaint concerning its condition and the large number of animals kept there. After arriving at the house, but before he entered to inspect it, Officer Cross "recognized that there would be an emergency situation." J.A. at 105. Also before entering, Cross called for assistance from adult protective services as well as a more experienced Code Enforcement Officer, Michael Bartley.

Before Cross went inside the home, Carol Baldauf, a representative from Netcare, an assistance agency for the elderly, arrived and entered. Baldauf remained in the living room with the two occupants for most of the time that elapsed until they were evicted, two or three hours later. Shortly after Baldauf entered, Sell summoned Cross inside to take a phone call from Penn, who informed him that she and Dr. Lautzenheiser had inspected the home two weeks previously and had found nothing that warranted a citation. Cross observed conditions while inside the home which confirmed, to him, his earlier inclination to effect an emergency eviction. Emerging, he told Officer Bartley, "It's bad in there. . . . I think I need to vacate it." J.A. at 113. Bartley replied, "If it needs vacated, go ahead." *Id.*

In response to a call from Cross and Bartley, Code Enforcement Officer Anthony Arnold, who was their supervisor, as well as a representative from the Humane Society and Animal Control department, Kerry Manion, and a fourth Code Enforcement Officer, Kenneth Reed, soon arrived at the scene. Officer Arnold, the supervisor, briefly inspected part of the house and authorized Cross to issue an emergency vacate order.

Thereupon, at about 11:00 A.M., Cross completed and signed the emergency eviction form. It stated: "Inspection of the above referenced site reveals that an emergency exists which requires immediate action to protect the public health and safety. The conditions causing this emergency to exist are as following: Unsanitary conditions due to amount of pets (33)." J.A. at 46.

Cross testified at his deposition that he issued the emergency vacate order because of the presence of animal feces and urine on the floor, which he believed posed a health risk. Although the City's emergency vacate order form provides for an abatement option,[2] Cross did not provide plaintiffs with an opportunity to clean the home, or cause it to be cleaned, or to remove some or all of the dogs. Instead he issued a written directive to "VACATE PROPERTY IMMEDIATELY." *Id.* (capitalization in original). In assessing later testimony explaining his decision, the district court noted that Cross "could not articulate any specific immediate threat . . . [but] believed that Plaintiffs' exposure to the unsanitary conditions inside the house was of sufficient danger to warrant immediately vacating the property." J.A. at 18. Cross himself testified that he did not know whether plaintiffs would have been harmed by staying in the house for two or three more days.

---

**2.** "You are hereby notified of the existence of this emergency and ordered to take immediate action to abate the emergency within ___ hours/days from receipt of this order." J.A. at 46.

Three or four days later, Cross posted an "Order for Building to be Kept Vacant."[3] The Order advised Sell and Cuckler of their right to appeal the eviction through a post-deprivation hearing. In a letter dated December 22, 1998, they requested a hearing, but they never received one. They were allowed to re-occupy the house on January 6, 1999. During the month the house was vacant, someone broke into it repeatedly and removed many of plaintiffs' belongings.[4]

The parties dispute the condition of the home on December 3, 1999. Sell maintains that conditions there on that date were substantially similar to what they had been during Dr. Lautzenheiser's inspection two weeks earlier, when he found nothing that would create an imminent health risk to the women or their dogs. Specifically, Sell testified that the floor of the house was clean, the outside cages had been hosed down that morning, and the inside cages had been cleaned the previous afternoon. Because Sell was ill with the flu on December 3, and had been ill for two or three days, she had not cleaned the front yard and was only cleaning the inside cages once a day. She stated there was no "debris" in the home, although "the front room was cluttered with knickknacks, Catholic statutes, and the like." J.A. at 56. Manion, the Humane Society officer, gave inconsistent testimony about whether or not he had observed dog feces on the living room floor. He described the home as "cluttered," but with "personal belong-ings" rather than garbage. *See* J.A. at 202. Baldauf, the manager of elder care services at Netcare, was present throughout the eviction proceedings. She testified that there were no dog feces on the floor of the living room and no odor of feces in the house. Like Sell, she described the home as "cluttered," but without signs of "soiling" or "filth." J.A. at 157. However, Cross and the other Code Enforcement Officers directly contradicted not only Sell, but also Baldauf, testifying to specific unsanitary conditions in the home, notably piles of dog feces on the living room and kitchen floors, and garbage, including discarded food containers, scattered throughout the house. Cross described his impression of the house as "[o]verwhelming smell of urine, dog feces; dog urine; feces that were on the floor; trash and debris." J.A. at 110. Arnold observed "garbage, trash ... dog feces on the floor." J.A. at 147. According to Reed, "[t]he floor was covered with dog feces, just trash and debris throughout the front room leading into the kitchen." J.A. at 152.

The district court, despite the foregoing, found "virtually overwhelming evidence regarding the condition of the premises on December 3, 1998 that supports a reasonable conclusion by Cross and the other Code Enforcement Officers that there was an immediate health risk to plaintiffs." J.A. at 34. The court determined that the City and individual defendants were entitled to judgment as a matter of law, and

---

**3.** After the eviction, Cross conducted a full inspection of the house and found a lack of smoke alarms, an unsafe heating system, a clogged drain in the basement, and roach and flea infestation. These code violations are listed in the two orders Cross subsequently issued. *See* J.A. at 47, 49.

The district court correctly concluded that the code violations found during Cross's extensive inspection of the house after the plaintiffs had been evicted could not serve as a

post-hoc rationalization for the emergency order to vacate, because these conditions were not apparent at the time the order was given. Neither party contests this conclusion.

**4.** Sell claims her household goods were stolen by Darrell Thomas, a neighbor and her former foster child. Thomas, who was previously convicted of receipt of stolen property, claims he disposed of the items with Sell's consent.

granted their motion for summary judgment, denying plaintiffs' cross-motion.

## II. ANALYSIS

The district court's summary judgment decision is subject to de novo review. *See, e.g., Chandler v. Specialty Tires of America, Inc.,* 283 F.3d 818, 822 (6th Cir.2002). Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Credibility determinations are a function reserved to the jury, and may not be resolved by the district court in ruling on a summary judgment motion, or by this court, in reviewing such a ruling. *See Russo v. City of Cincinnati,* 953 F.2d 1036, 1041–1042 (6th Cir.1992). In reviewing the district court's grant of summary judgment to defendants, we view the evidence and all reasonable inferences drawn therefrom in the light most favorable to plaintiff-appellants, as the nonmoving party. *See Rodgers v. Monumental Life Ins. Co.,* 289 F.3d 442, 448 (6th Cir.2002) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

At least since the time of Sir Edward Coke, it has been a fundamental principle of Anglo–Saxon law that "a man's home is his castle." *Institutes,* III.73. Accordingly, "the prohibition against the deprivation of property without due process of law reflects the high value, embedded in our constitutional and political history, that we place on a person's right to enjoy what is his, free of governmental interference." *Fuentes v. Shevin,* 407 U.S. 67, 81, 92 S.Ct.

1983, 32 L.Ed.2d 556 (1972) (citation omitted). The constitutional right to a hearing prior to eviction from one's home is well-established. *See Fuentes,* 407 U.S. at 81–82; *see also Flatford v. City of Monroe,* 17 F.3d 162, 167 (6th Cir.1994).

To put it simply, the guarantee of a pre-eviction hearing is the rule dictated by the Constitution. However, there is an exception to that rule. The Sixth Circuit recognizes a resident's constitutional right, grounded in the Fourth Amendment and the Due Process clause, to "pre-eviction judicial oversight in the absence of emergency circumstances." *Flatford,* 17 F.3d at 170. The "emergency circumstances" exception is carefully tailored:

> A prior hearing [before eviction] is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a government official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance.

*Id.*

In other words, the due process requirement of a hearing prior to eviction may be bypassed only if an authorized government official, adhering to limited, statutorily prescribed standards, finds that immediate eviction without a hearing is "necessary and justified" to further an important governmental interest, most commonly the protection of its citizens' health and safety. The City relies on Columbus City Code § 4509.06 as the "narrowly drawn statute" pursuant to which it may order emergency evictions.[5]

---

5. Section 4509.06 of the Columbus City Code provides that:

(a) Whenever the Development Regulation Administrator finds that an emergency exists which requires immediate action to protect the public health and safety or the

health and safety of any person, he may issue an order reciting the existence of such an emergency and requiring that such action as he deems necessary be taken to meet the emergency. Notwithstanding the other provisions of this Housing Code, such order

The issues of the City's custom and practice of allowing Code Enforcement Officers to order emergency evictions, despite their questionable authority to do so, the City's training of its officers, and the officers' qualified immunity defense are before us, as they were before the district court on cross-motions for summary judgment. We are persuaded that a remand is necessary, because the record in this fact-intensive case is inadequate and the relevant statute, Columbus City Code § 4509.06, was insufficiently analyzed by the court below.

### A. Section 1983 Claims Against Columbus

The City of Columbus can be held liable under § 1983 only if the municipality violated plaintiffs' constitutional rights by unlawfully evicting them from their home pursuant to a municipal custom or policy, or, in certain cases, the lack thereof. Plaintiffs allege that the City of Columbus violates its citizens' rights to the constitutional due process of notice and a hearing prior to eviction through (1) its custom and practice of allowing unauthorized Code Enforcement Officers to order emergency evictions and (2) its failure to train its officers to recognize the limited circumstances that make eviction without a pre-deprivation hearing permissible.

Municipalities can be held liable under § 1983 only where the action of the municipality itself can be said to have caused the harm, as when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Mo-*

*nell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a municipal custom or policy, not formalized as law, may also be actionable under § 1983. A municipality "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994). To attach such liability to the municipality, a plaintiff must show "a direct causal link between the custom and the constitutional deprivation." *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 508 (6th Cir.1996); *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question of whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").

A city may also be liable, in narrow circumstances, for failure to train its officials, if that failure gives rise to a clearly foreseeable violation of constitutional rights reflecting deliberate indifference to them:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy-makers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be

shall be effective immediately and complied with immediately.

  (b) If necessary to protect the public health and safety or the health and safety of any person where an emergency exists in an occupied building, the Administrator

shall order that the premises be vacated forthwith and further that they shall not be reoccupied until the conditions causing the emergency to exist have been abated and approved by the Administrator.

said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnotes omitted).

### 1. Authorization to Order Emergency Evictions

■ Plaintiff-appellants claim that a Code Enforcement Officer is not a governmental official authorized by law to determine that eviction is justified in a particular instance. The relevant statute states that only "the Development Regulation Administrator" may declare an emergency and order immediate action to redress an emergency, which may include posthaste eviction. § 4509.06. Although the Columbus City Code does not define "the Development Regulation Administrator," § 4501.073 of the municipal code, in place at the time of plaintiffs' eviction, identified a Code Enforcement Officer as the "Development Regulation Administrator or any of his duly authorized representatives."[6] This implies that the rank and file Code Enforcement Officers are subordinate agents of the individual holding the title or responsibility of the development regulation administrator.

The emergency eviction of Sell and Cuckler by a Code Enforcement Officer represents the City's custom and practice, rather than an isolated incident. The district court credited the undisputed testimony of Michael Farrenkopf, manager of the Code Enforcement Section, that all

Code Enforcement Officers are authorized to issue emergency vacate orders. Additionally, the district court noted that the City's pre-printed emergency vacate orders have a signature block for the Code Enforcement Officer. This is undisputed evidence of the City's practice. It does not establish whether that the practice is authorized by law.

The district court concluded that Code § 4509.06, despite its "plain language" to the contrary, J.A. at 26, grants authority to issue emergency vacate orders to Code Enforcement Officers. The district court dismissed the Code phrase "Development Regulation Administrator" as an inadvertent carry-over from a repealed ordinance. The court concluded that a January 1998 ordinance had abolished the Development Regulation Division and replaced it with the Department of Trade and Development.[7] *See* Columbus City Code § 215.01. From this it follows, according to the district court, that, for the purposes of § 4509.06, Code Enforcement Officers replaced "the Development Regulation Administrator."

The conclusion that abolition of the Development Regulation Division vested authority in rank and file Code Enforcement Officers to order emergency evictions is not supported as a matter of law. If the office of "the Development Regulation Administrator" no longer exists, it would logically follow that the city would have transferred the authority to issue emergency vacate orders to the person holding a posi-

---

6. Section 4501.073 was revised in 2001, and now states that " 'Code enforcement officer' means a property maintenance [inspector], or a property maintenance inspector trainee, and is a duly authorized representative of the director."

7. However, appellants argue as a matter of fact that the February 1998 ordinance merely effected a reorganization of the Development Regulation Division but did not abolish it.

Indeed, the language of the ordinance refers to amendment of the City Code "in order to facilitate changes in the organizational structure of the Department of Trade and Development." Columbus Ord. No. 169–98 (January 31, 1998). This issue is not sufficiently developed on appeal to be resolved, but may present a disputed issue of material fact for resolution on remand.

tion equivalent to that of "the Development Regulation Administrator" in the new Department of Trade and Development, rather than to all Code Enforcement Officers. The definition of "administrator" in the housing code was removed by repeal in 2001, *see* Columbus City Code § 4501.025, but the definition of the "director" was added. " 'Director' when used without clarification means the director of the department of development or his or her designee." Columbus City Code § 4501.085. As such, if the term "director" were substituted for "administrator" in § 4509.06, the director or his or her designee would have the power to declare an emergency under § 4509.06(a) and evict the premises without a hearing.

Code Enforcement Officers were "duly authorized representatives" of the administrator, and are now duly authorized representatives of the director, but that does not necessarily mean that each and every Code Enforcement Officer is a designee of the director. Use of the term "designee" in Columbus City Code § 4501.085 implies a specific, affirmative action by the director designating an individual to act in his or her stead. *See* Black's Law Dictionary 457, 1304 (7th ed. 1999) (defining "designee" as "A person who has been designated to perform some duty or carry out some specific role" and defining "representative" as "One who stands for or acts on behalf of another."); *see also Moreau v. Klevenhagen*, 508 U.S. 22, 35, n. 7, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993).

As a general rule of interpretation, Columbus permits authority given by the City Code to an officer to be exercised by a "deputy or subordinate, unless contrary to law or to the clear intent of any such particular provision." Columbus City Code § 101.03(a). In this case, the language of § 4501.085, referring to "the director of the department of development or his or her designee," signals a clear intent that the exercise of the director's authority be limited to that individual or to those individuals specifically designated, rather than all of the employees of the Department of Trade and Development (including the Code Enforcement Officers), who are subordinate to the director. In addition, in light of *Flatford's* mandate that statutes authorizing emergency eviction without a hearing be "narrowly drawn," any interpretation of the Columbus housing code that widely and indiscriminately delegates authority to evict residents without a hearing would be contrary to law.

It is not evident on the record before us whether either Cross or his supervisor, Code Enforcement Officer Arnold, were duly authorized designees of the director of the Department of Trade and Development for the purpose of ordering an emergency eviction pursuant to § 4509.06 of the City Code. If they were, the City is entitled to summary judgment on this issue. If they were not, the district court must consider on remand whether the City's custom and policy of allowing unauthorized officials to order emergency evictions was a proximate cause of the alleged deprivation of plaintiffs' due process rights. These issues remain to be decided on remand following further factual development.

### 2. Failure to Train Code Enforcement Officers

Plaintiff-appellants allege that the City fails to train adequately its Code Enforcement Officers to recognize situations appropriate for emergency eviction and follow appropriate procedures in the event of an emergency. They particularly note that the City has no policy to guide its Code Enforcement Officers' determination as to when conditions in a residence justify

the issuance of an emergency vacate order without a pre-eviction hearing. Indeed, the district court found that "no official policy that helps officers determine when ... conditions may justify the issuance of an Emergency Vacate Order." J.A. at 28. The district court found no deliberate indifference on the part of the City, however, because Code Enforcement Officers "are given sufficient education in the classroom and training in the field to enable them to determine, on a case-by-case basis, when an Emergency Vacate Order should be issued." *Id.* at 29–30.

The district court's conclusion misses the central issue, and the thrust of plaintiffs' allegations. The allegation is not that the City violated the plaintiffs' constitutional rights by failing to delineate for its officers each and every condition, and the severity of such conditions, giving rise to an emergency necessitating eviction without a hearing. Rather, plaintiffs argue that the City failed to train and instruct its officers on the constitutional obligations underlying their job responsibilities. "Defendant City of Columbus deliberately failed to ... supervise, train, and discipline its employees so that they could carry out the seizure of houses ... in compliance with the constitutional requirements." J.A. at 13 (Am. Compl. at 6).

The record before us on appeal indicates that the Code Enforcement Officers received thorough practical training to assist them in the discharge of many aspects of their responsibilities. Code Enforcement Officers undergo extensive classroom training on topics including the housing code, vacate and emergency vacate orders, buildings unfit for habitation, and unsanitary conditions. In addition to classroom instruction, Code Enforcement Officers receive field training by accompanying senior officers and supervisors on home inspec-

tions, some of which result in the issuance of vacate or emergency vacate orders.

However, for aught that appears on the record before us, the municipality provided no instruction or training for Cross and other Code Enforcement Officers that the Constitution, as authoritatively construed, prefers hearing before eviction and that accordingly, before evicting a homeowner, officers should affirmatively consider whether a particular emergency is so time-sensitive and a pre-eviction hearing would be so time-consuming that a delay of physical eviction required by a hearing would materially aggravate the conditions that the eviction is addressing.

Specifically, there is no evidence in the record that the training related to both vacate and emergency vacate orders included training for Code Enforcement Officers to differentiate between emergencies where time and circumstances do not preclude a hearing, and those relatively dire emergencies posing a threat to health and safety of individuals or the public that require eviction without first holding a hearing. Indeed, there is no indication in the record that the municipality trained the Code Enforcement Officers about, for example, the time required to conduct a pre-eviction hearing and the procedures for an emergency one, perhaps analogous to the streamlined procedures police officers employ to obtain a warrant for an emergency search. Farrenkopf's testimony that the officers' field experience training "includes familiarization with other agencies which may be contacted if a potential emergency exists, including Adult Protective Services, mental health agencies, and animal agencies," J.A. at 51, conspicuously omits any reference as to who a Code Enforcement Officer should call to arrange for an emergency hearing. This shortcoming is reflected in the forms provided for the officers' use: the Emergency

Order form reminds an officer of the abatement alternative to forthwith physical eviction, but nothing on the form prompts the officer to consider a pre-eviction hearing. The Order to be Kept Vacant and Order for Building to be Kept Vacant forms only refer to a *post*-eviction appeal. *See* J.A. at 46–47, 49.

On remand, the district court should further develop the factual record, focusing on the extent of the training and instruction the City provides to its Code Enforcement Officers on these crucial topics. If Columbus failed to instruct or train the officers responsible for emergency evictions about their constitutional responsibility to provide a hearing in all but "extraordinary situations" where exigent circumstances preclude them from doing so, *Fuentes,* 407 U.S. at 82, that shortcoming is one that is so likely to lead a violation of the constitutional right to due process as to be deliberate indifference to citizens' constitutional rights, and give rise to municipal liability under § 1983.

## B. Section 1983 Claims Against Individual Code Enforcement Officers

To establish a cause of action against the individual defendants, plaintiff-appellants must establish that the Code Enforcement Officers were acting under the color of law and deprived them of a right clearly established by the Constitution or other federal law. *See Doe v. Wigginton,* 21 F.3d 733, 738 (6th Cir.1994). The parties agree that defendants satisfy the first prong; they were acting under color of law. Sell and Cuckler contend that individual defendants violated plaintiffs' due process rights by evicting them from their home without a hearing, and conducted the eviction in such an unreasonable manner as to give rise to

a violation of the Fourth Amendment's prohibition of unreasonable seizures.

Defendant-appellees concede that the right to a pre-eviction hearing is well-established by *Fuentes* and *Flatford.* They respond, however, that their actions fall within the exception to that recognized constitutional right, because unsanitary conditions created an emergency that necessitated eviction without a hearing. Moreover, even if such emergency did not exist, or eviction was not in fact necessary, the individual Code Enforcement Officers claim that their qualified immunity should relieve them of liability.[8] *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Where plaintiffs are able to show violation of their constitutional rights, a governmental official acting in a discretionary capacity is entitled to qualified immunity unless "that right was clearly established such that a reasonable government official would have realized that his challenged actions were in violation of that right." *Heggen v. Lee,* 284 F.3d 675, 679 (6th Cir.2002).

### 1. Authorization to Order Emergency Eviction

As stated above, it is not certain that Code Enforcement Officers are designated officials with the power to declare an emergency and order an emergency eviction without a hearing under § 4509.06. The individual defendants are entitled to immunity only if they are authorized by law to order an immediate eviction. "In order to establish his entitlement to qualified immunity, [defendant] must first show that he was acting within the scope of his discretionary authority when the incident occurred." *Gravely v. Madden,* 142 F.3d

---

**8.** Defendants' brief on appeal does not engage the issue of whether their conduct equates to an unreasonable Fourth Amendment seizure.

But as discussed *infra,* plaintiffs' argument on appeal provides no basis to reverse the district court on Fourth Amendment grounds.

345, 347 (6th Cir.1998). Further factual development is required to determine whether § 4509.06 of the Columbus City Code authorizes Code Enforcement Officers to order an immediate, emergency eviction.

### 2. Reasonableness of the Code Enforcement Officers' Actions

Assuming arguendo that the officers were acting within the scope of their authority, we turn to the dispositive question of "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### a. Finding and Declaring an Emergency

In determining that the Code Enforcement Officers were entitled to qualified immunity, and therefore to summary judgment, the district court treated the following as undisputed facts:

> Ms. Sell had been sick with the flu for four days prior to December 3, 1998. She admits that many of the dogs kept outside had diarrhea. The dog cages inside the house were filthy. All who entered the house on December 3, 1998 complained of the smell. Cross, Reed, and Arnold also saw other trash and debris on the floor. Arnold described the conditions as "extremely filthy" and "unhealthy." Darrell Thomas testified that after Plaintiffs left, he threw out the couch because it was saturated with dog

urine and threw out Ms. Sell's mattress because it was saturated with "dog poop."

J.A. at 34 (record citations omitted).

Sell and Cuckler do not dispute that Sell was ill with the flu, that some of the outside dogs had diarrhea, and that the inside dog cages had not been cleaned since the previous afternoon. The serious illness of a resident, caused or aggravated by conditions in the home, would be a reasonable basis for a Code Enforcement Officer to order an immediate eviction due to the risk to human health. But it is unclear on this record if Cross was even aware that Sell was ill with the flu. Moreover, if he knew she was sick, he must have reasonably connected her illness to conditions in the home and reasonably concluded that her illness, and her attendant inability to adhere to her normal routine in cleaning up after the dogs, posed an immediate risk to her health or her mother's health, necessitating eviction without a hearing.

■ The health of the outside dogs could not provide a reasonable Code Enforcement Officer with a basis for ordering an emergency eviction. An emergency vacate order may be issued only "where an emergency exists in an occupied building." § 4509.06(b). In addition, the code addresses only risks to human, as distinguished from animal, health and safety. *See id.*

Although the remaining facts cited by the district court are disputed,[9] we, like

---

9. The Code Enforcement Officers claimed the house smelled unwholesome, but Baldauf—who was present inside the house for the bulk of the morning on December 3, far longer than any of the officers—testified, consistent with Dr. Lautzenheiser's observations two weeks earlier, that it smelled only of dog. The Code Enforcement Officers' testimony

about trash and debris, and their attendant characterization of the home as filthy and unhealthy, is directly contradicted by the testimony of Sell, Baldauf, and Manion, who saw "clutter" consisting of knickknacks and personal items, not garbage. Finally, the possibility that Thomas stole appellants' bed and

the district court, are persuaded that the undisputed accumulation of feces in the inside dog cages, alone, provided a reasonable basis for a Code Enforcement Officer to declare an emergency. Sell testified that she ordinarily cleaned the cages "a dozen times a day," J.A. at 91, as needed, but because she was sick with the flu in early December 1998, she was cleaning the cages once a day, in the afternoon. She does not contradict that there were feces present in at least some of the six cages inside the home on the morning of December 3. A reasonable Code Enforcement Officer could perceive that the feces posed a risk to human health. As the district court observed, "[c]ommon sense dictates that when a large number of animals are kept in a confined area, unsanitary conditions may result if the pet owners are not diligent in cleaning up after their pets." J.A. at 29. However, eviction is justified only "[i]f *necessary* to protect the public health and safety or the health and safety of any person," § 4509.06(b) (emphasis added). There remains a disputed issue of fact as to whether a reasonable Code Enforcement Officer, in response to the localized problem posed by unclean dog cages, would order that the cages be cleaned or removed or find it necessary that the homeowners be evicted without a hearing.

### b. Ordering Eviction Without a Hearing

The emergency eviction order here stated on its face that "unsanitary conditions due to amount of pets (33)" created the "emergency ... which requires immediate action to protect the public health and safety." J.A. at 46. However, there is nothing in the record to indicate whether, after finding the existence of an emergency requiring "immediate action," Cross (or his supervisor, Arnold) considered whether it was "necessary" in the particular circumstances here to order plaintiff-appellants to vacate their home without first affording them a pre-deprivation hearing.

As a general principle, the Constitution allows summary eviction without the procedural due process of a pre-deprivation hearing only when necessitated by exigent circumstances to "[p]rotect[ ] citizens from an immediate risk of serious bodily harm." *Flatford,* 17 F.3d at 167. In *Flatford,* for example, the building inspector found exposed wiring and improperly stored combustibles in a wood-framed apartment building, which he reasonably believed posed "an immediate risk of electrocution or fire." *Id.* at 162. Similarly, in *Mitchell v. City of Cleveland,* No. 97–4206, 1998 WL 898872 (6th Cir. Dec. 17, 1998), the building inspector testified that "the inadequate and defective electrical system, constituted cause to order the building vacated to prevent serious injury or death." *Compare Zakaib v. City of Cleveland,* No. 77402, 2001 WL 406209 (Ohio Ct.App. April 19, 2001) (drawing a distinction between unsanitary emergency conditions and emergency conditions necessitating an eviction without a hearing).[10]

---

couch prevents his testimony from being considered as an undisputed fact.

10. In *Zakaib,* the inspection of grocery store and upstairs apartment found numerous violations of the housing code: a gas leak and numerous electrical problems that created a hazard of fire and explosion, faulty flues for venting carbon monoxide that also created "a hazard to life," raw sewage in the basement adjacent to food stored prior to its sale to the public, and unsanitary conditions including rodent infestation, "junk and debris piled in the back of the store" and garage, and "animal waste and food." 1998 WL 898872 at *3–4. Applying the logic of *Mitchell,* the *Zakaib* court held that the eviction was warranted, but only by the hair-trigger risks such as electrocution, fire, a gas explosion, carbon monoxide poisoning, or the public health risk posed by contamination of food for sale to the

In accordance with the clear constitutional mandate that an eviction without a hearing occur only in emergency circumstances, and precedents from this circuit limiting those emergency circumstances to those situations where eviction is "necessary and justified," *Flatford,* 17 F.3d at 170, Columbus City Code § 4509.06(b) directs that an emergency eviction (presumably without the benefit of a pre-eviction hearing) may be ordered only "[i]f necessary to protect the public health and safety or the health and safety of any person where an emergency exists in an occupied building, the administrator shall order that the premises be vacated forthwith." Section 4509.06(a) provides that whenever the relevant official "finds that an emergency exists which requires immediate action to protect the health and safety of any person, he may issue an order reciting the existence of such emergency and requiring that such action as he deems necessary be taken to meet the emergency."

Although this "immediate action" could arguably include eviction, that reading would render subsection (b) redundant. "Under accepted canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Menuskin v. Williams,* 145 F.3d 755, 768 (6th Cir. 1998) (internal quotation, citation omitted).

Additionally, the Supreme Court has warned against "applying a general provision when doing so would undermine limitations created by a more specific provision." *Varity Corp. v. Howe,* 516 U.S. 489, 511, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) (internal citations omitted); *see also Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 405 (6th Cir.1998) (en banc). The powers granted to the administrator in § 4509.06(a) ("such action as he deems necessary") are broader than those conveyed by § 4509.06(b), which deals only with immediate eviction. An official can order lesser remedies (such as abatement, or a hearing to determine if eviction is necessary) "as he deems necessary" upon a finding that an emergency exists which requires immediate action. But summary eviction without a hearing, which requires a government official to make a conscious exception to the constitutional rule of holding a hearing before evicting a resident from his or her home, may not be ordered unless the official makes an additional finding that immediate eviction is necessary to protect health and safety, or to state it another way, that the emergency is so time-sensitive that postponing eviction to hold a hearing would jeopardize health and safety.

It is quite possible that a reasonable Code Enforcement Officer, after giving the matter due consideration, could conclude that the unsanitary conditions in the Sell and Cuckler home posed such an extreme risk to the health and safety of the two elderly residents that there was not time to order abatement of the unsanitary conditions or hold a pre-eviction hearing. But it is unclear if Cross, Arnold, and the other Code Enforcement Officers engaged in this sort of analysis. The record before us

public with raw sewage, as distinguished from those conditions, such as "junk and debris" and "animal waste" that were merely unsanitary:

> The resulting inspection for building code violations revealed many and varied hazards, some immediate, some not. The serious hazards, such as the incorrect pitch of the flue, the raw sewage in the basement where food was stored, and the electrical violations, as well as the gas leak, were sufficient to warrant the immediate evacuation and closure of the premises.

*Id.* at *7.

indicates that Officer Cross, and his fellow officers, after determining that conditions in the Sell residence required immediate action, gave little, if any, consideration to immediate action options other than vacating the home immediately. The record does not indicate whether the officers did so because they reasonably believed an emergency eviction without awaiting even an expedited hearing was necessary under the circumstances to protect plaintiffs' health and safety (and simply failed to articulate this in their deposition testimony), or because they never considered the constitutional and statutory limitations on evictions without a hearing.

Nor does it appear that the district court focused on this issue. *See* J.A. at 33 ("[T]he court need only determine that a reasonable Code Enforcement Officer could conclude that *immediate action* was required to protect the health and safety of the Plaintiffs.") (emphasis added). There is a significant difference between "immediate action" and immediate eviction. The district court did not address the issue of whether a reasonable Code Enforcement Officer, after concluding that immediate action was required to protect plaintiff's health and safety, in accordance with § 4509.06(a), would then determine, consistent with § 4509.06(b), that the health and safety risk posed by this particular emergency was such that immediate eviction without a hearing was necessary. On remand, the district court should determine whether the officers here made such a determination.

### c. Manner of Plaintiffs' Eviction

■ The district court dismissed Sell and Cuckler's claim that the manner of their eviction violated the Fourth Amendment. Their claim is premised on the allegation that Cross provided them with only fifteen minutes' notice, forcing them to leave their home without adequate time to pack their medication, clothing, and other belongings. The district court relied on undisputed testimony from Baldauf and the plaintiffs themselves to find that they were given ample time, approximately ninety minutes, between the time Cross informed them they would have to vacate the premises and their actual departure. Plaintiffs' argument on appeal, that there was confusion on the morning of December 3 about whether the house would have to be vacated, does not provide a sufficient basis to disturb this finding.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings consistent with this decision.