NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0244n.06
Filed: April 1, 2005

No. 03-4654

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| BONNIE SELL et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF OHIO |
| CITY OF COLUMBUS et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | OPINION |
| | ) | |
| | ) | |
| | ) | |

**Before: MARTIN and GILMAN, Circuit Judges; and COHN, District Judge.**[*]

**RONALD LEE GILMAN, Circuit Judge.** Bonnie Sell and her mother, Natalie Cuckler, were evicted from their residence by Columbus Code Enforcement Officers after the officers discovered that the two women kept 33 dogs and 4 birds on or about the premises in unsanitary conditions that, in the officers' opinion, posed an immediate threat to the women's health. Sell and Cuckler subsequently brought this action against the City of Columbus and against the individual officers, claiming that the officers had unconstitutionally evicted them without a pre-eviction hearing. After the district court entered summary judgment in favor of the defendants, the plaintiffs

---

[*]The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

appealed. A prior panel of this court reversed the district court's grant of summary judgment and remanded the case for further factfinding.

On remand, the district court again concluded that the individual defendants were entitled to qualified immunity, but submitted to the jury the question of whether the city had violated the plaintiffs' due process rights. The jury found that the plaintiffs' constitutional rights were not violated. Judgment was subsequently entered in favor of the city. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

Sell and Cuckler are two elderly women who live together in a one-story, two-bedroom house in Columbus, Ohio. At the time the following events transpired, Sell was 65 years old and her mother, Cuckler, was 83. The two women are avid animal lovers who had joint ownership of some 33 dogs and 4 birds, which they kept either in cages inside their home or in kennels immediately outside.

In November of 1998, Barbara Penn, the director of a Columbus organization called Animal Rescue, became concerned about the large number of dogs being kept by the plaintiffs. She contacted Dr. Robert Lautzenheiser, the Public Health Veterinarian for the City of Columbus, and asked him to pay a visit to the plaintiffs' residence in order to check on the health of the animals. Accompanied by Cal Collins, an official with the city's sanitation department, Dr. Lautzenheiser arrived to inspect the plaintiffs' animals on the morning of November 20, 1998.

During this hour-and-a-half visit, Dr. Lautzenheiser examined all of the dogs, finding them

to be "in good physical shape." Some of the older dogs had chronic health problems, but, according

to Dr. Lautzenheiser, "they were being taken care of. They were in good condition." The two men

also inspected the residence's living room and kitchen areas. Dr. Lautzenheiser found that

> [o]f course walking in the house, there was a distinct odor that animals were definitely in there. In the living room area, we did not find any bowel movement or droppings or anything like that on the floor. It was—you know, it appeared to be clean. I could not state whether the dogs had been wetting on the floor or not. So those spots could not be determined. [In t]he kitchen area, there was no bowel movements in there. The dogs that were in cages, there were a couple of cages that did have fresh droppings in them that could have just come when we walked in the door.

When asked at trial whether the situation presented "unsanitary conditions," Dr. Lautzenheiser

responded that "[a]t the time that we were there, [it] was not in our opinion, a health risk." He also

felt that Sell and Cuckler were not "rookies" when it came to taking care of a large number of dogs.

Approximately a week after Dr. Lautzenheiser's visit, Sell became seriously ill with the flu.

This prevented her from cleaning out the outdoor dogs' cages twice daily, as was her custom. The

illness also impaired her ability to clean out the cages of the indoor dogs, although she claims to

have attended to them at least once per day and to have been diligent in mopping up any "accidents."

During Sell's illness, someone—the record is unclear as to who—filed a formal complaint with the

City of Columbus Department of Trade and Development regarding the number of dogs at the

plaintiffs' residence. In response, defendant Anthony Arnold, a supervisor with the department,

directed defendant John Cross, a Code Enforcement Officer employed by the department, to

investigate.

Cross arrived at the plaintiffs' house on the morning of December 3, 1998. Two representatives from the city's Adult Protective Services were already there, standing outside and chatting with Sell. On seeing Cross, Sell became nervous and asked him if he was there to take her dogs away. Cross replied that his priority was to make sure that the residence was safe for the two women to live there. He then called for backup, and defendant Mike Bartley, another Code Enforcement Officer, arrived on the scene a few minutes later.

While Cross and Bartley spoke with each other outside the house, Sell went inside and, anxious about her animals, called Penn (the director of Animal Rescue) for assistance. Penn in turn asked to speak to the individual in charge. At this point, Sell called over to Cross, invited him into the house, and passed him the phone. Cross and Penn spoke briefly, after which Cross began looking around the house. He inspected the front living room area and then investigated the backyard, finding that the house in general exhibited an "[o]verwhelming smell of urine, dog feces, [and] dog urine." In addition, he noted feces on the floor, as well as "trash and debris." He observed "probably nine or ten dogs in cages in the kitchen area and one dog tied to the refrigerator, and dogs locked up in every bedroom and maybe in the basement, and general unsanitary conditions."

Cross exited the house and walked over to Bartley, who had been waiting outside, telling him that "it was bad in there . . . I think I need to vacate it." In response, Bartley—who had not yet gone inside the house—told him that "[i]f it needs to be vacated, go ahead." The men proceeded to make several phone calls. They contacted their supervisor, Arnold, and asked him to come over. In addition, the men called the Humane Society and Animal Control to assume responsibility for the

plaintiffs' animals. Another Code Enforcement Officer, Kenneth Reed, had heard about the situation on the official radio channel and also arrived on the scene.

After Arnold inspected part of the house, he gave Cross the authorization to issue an Emergency Vacate Order. Cross then completed and signed the eviction form, which stated:

> Inspection of the above referenced site reveals that an emergency exists which requires immediate action to protect the public health and safety. The conditions causing this emergency to exist are as follows: Unsanitary conditions due to amount of pets (33). Vacate property immediately—do not reoccupy until code violations are abated.

Cross gave Sell a copy of the order and instructed her and her mother to gather their immediate belongings and leave the property. The women were told that they could not return to the house until it was cleaned up, and that they could be arrested for trespassing if they did. In compliance with the order, the women moved out that day. The house remained unoccupied from December 3, 1998 until January 6, 1999, when they finally moved back in.

**B.    Procedural background**

Sell and Cuckler promptly filed suit in late January of 1999, claiming that the defendants—Arnold, Bartley, Cross, Reed, and the City of Columbus—violated the plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights. Both sides moved for summary judgment.

The district court first considered and rejected the plaintiffs' argument that the Code Enforcement Officers were not authorized under the Columbus City Code to issue Emergency Vacate Orders. With regard to the plaintiffs' claim against the City of Columbus, the district court determined that the plaintiffs had failed to show as a matter of law that that the city was deliberately

indifferent in failing to train its Code Enforcement Officers regarding Emergency Vacate Orders.

The district court then considered the defendants' arguments. It held that the individual officers were entitled to qualified immunity, and it dismissed the plaintiffs' claims against the city on the basis that they had not demonstrated as a matter of law that the city was deliberately indifferent to the constitutional rights of its citizens. The plaintiffs appealed.

A unanimous Sixth Circuit panel reversed the district court's grant of summary judgment to the defendants. *Sell v. City of Columbus*, No. 00-4467, 2002 WL 2027113 (6th Cir. Aug. 26, 2002) (unpublished) (hereinafter *Sell I*). The panel concluded that it could not tell from the record whether the Code Enforcement Officers were authorized to issue Emergency Vacate Orders. *Id.* at *7. It therefore remanded the case back to the district court on the issue of whether the Code Enforcement Officers were "duly authorized designees" of the Director of the Department of Trade and Development. *Id.* at *6-7.

The panel also concluded that further factfinding was necessary to determine whether the City of Columbus had failed to train the Code Enforcement Officers on how to handle Emergency Vacate Orders. *Id.* at *8-9. With regard to the claims against the individual defendants, the panel reversed the grant of qualified immunity and again concluded that further factfinding was necessary, this time to determine whether a reasonable Code Enforcement Officer would have understood that "the health and safety risk posed by this particular emergency was such that immediate eviction without a hearing was necessary." *Id.* at *12.

On remand, the district court held that the Code Enforcement Officers were authorized to issue Emergency Vacate Orders under the Columbus City Code, a determination based on affidavits submitted by the Director of the Department of Trade and Development and his deputy. It further determined that the individual defendants were entitled to qualified immunity because, "on the date in question, there was no controlling case law that would have put the Code Enforcement Officers on notice that the situation confronting them was not sufficiently serious to justify immediate eviction."

But with respect to the plaintiffs' claim that the City of Columbus acted with deliberate indifference in training the officers, the court concluded that there still existed a genuine issue of material fact. It therefore denied the city's motion for summary judgment. A two-day trial focusing on this question was conducted. The jury returned a verdict for the city, finding that the plaintiffs' constitutional rights were not violated. This timely appeal followed.

## II. ANALYSIS

### A.    Standard of review

The district court's grant of summary judgment is reviewed de novo. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1996). The central issue is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 251-252 (1986).

**B.      The district court did not err in concluding that the Code Enforcement Officers were
          authorized to issue Emergency Vacate Orders**

The plaintiffs first argue that the Code Enforcement Officers were not authorized to issue

Emergency Vacate Orders of the kind used to evict the plaintiffs from their home.  At the time of

the plaintiffs' eviction, the relevant portion of the Columbus City Code provided as follows:

> If necessary to protect the public health and safety or the health and safety of any
> person where an emergency exists in an occupied building, the administrator shall
> order that the premises be vacated forthwith and further that they shall not be
> reoccupied until the conditions causing the emergency to exist have been abated and
> approved by the administrator.

Columbus City Code § 4509.06(b) (1994).  (All of the relevant Columbus City Code sections were

amended by city ordinance on June 1, 2001.)  Pursuant to then-existing § 4501.025, the term

"administrator," when used without clarification, referred to "the development regulation

administrator."  A "Code Enforcement Officer," the title held by the individual defendants in this

case, was a "development regulation administrator or any of his duly authorized representatives."

Columbus City Code § 4501.073 (1994).

Complicating the matter further is the fact that the Development Regulation Division was

abolished effective February 8, 1998, over ten months *before* the events in question took place.  This

fact leads the plaintiffs to argue that "[t]he city on its own abolished the Development Regulation

Division and its Administrator and transferred, on its own and illegally, the authority to issue

immediate vacate orders to rank and file Code Enforcement Officers."

The district court, in its original disposition of the case, rejected this argument. It found that the "language in Columbus City Code §§ 4509.06 and 4501.073, referring to the 'development regulation administrator' appears to be inadvertently carried over from the time when the Development Regulation Division still existed." In place of the Development Regulation Division, the district court determined, "stands the Department of Trade and Development." The district court further credited the testimony of Michael Farrenkopf, manager of the Code Enforcement Section for the Department of Trade and Development, who stated that all Code Enforcement Officers are authorized to issue Emergency Vacate Orders.

*Sell I*, however, concluded that "[i]f the office of 'the Development Regulation Administrator' no longer exists, it would logically follow that the city would have transferred the authority to issue emergency vacate orders to the person holding a position equivalent to that of 'the Development Regulation Administrator' in the new Department of Trade and Development, rather than to all Code Enforcement Officers." *Sell I*, 2002 WL 2027113, at *6. The panel further determined that "[t]he definition of 'administrator' in the housing code was removed by repeal in 2001, but the definition of the 'director' was added. 'Director' when used without clarification means the director of the department of development or *his or her designee*." *Id.* (emphasis added) (citations and quotation marks omitted). Because the record failed to provide sufficient information upon which the panel could determine whether the Code Enforcement Officers were duly authorized "designees" of the Department's director, *Sell I* then remanded the question to the district court for further factfinding. *Id.* at *7.

On remand, the district court again concluded that the Code Enforcement Officers were duly authorized to issue Emergency Vacate Orders. It relied on two affidavits, one from George Arnold, the Director of the Department of Trade and Development, and the other from his deputy, Kathy Kerr. Arnold stated that "it was my intention, understanding and belief that Code Enforcement Officers (including supervisors) were my duly authorized representatives to enforce the provisions of the Columbus Housing Code and to issue notices and orders consistent with the provisions of the Code." Kerr likewise averred that "Code Enforcement Officers (including supervisors) were delegated the authority to make inspections and enforce the provisions of the Columbus Housing Code. This delegation included the authority to issue 'emergency orders,' as provided for in Columbus City Code § 4509.06." The district court found that these two affidavits were "sufficient to establish that, on the date in question, the Director of the Department of Trade and Development had designated all Code Enforcement Officers as his duly authorized designees for the purpose of issuing Emergency Vacate Orders."

The plaintiffs contend that the district court erred in so ruling. They claim that the two affidavits do not demonstrate that the Director has taken specific action to authorize the Code Enforcement Officers to carry out the task of issuing Emergency Vacate Orders. In support, they point to the fact that (1) there was "never a document signed by the Director naming any particular person as a person authorized to order emergency evictions," (2) neither Cross nor Anthony Arnold recalls ever "signing any document" authorizing them to issue Emergency Vacate Orders, and (3) none of the Code Enforcement Officer positions "lists issuing immediate vacate orders as one of their duties." The plaintiffs also argue that the district court unreasonably relied on the affidavits

of George Arnold and Kathy Kerr because "whether a Code Enforcement Officer is a duly authorized designee is a legal conclusion" that neither the Director nor his deputy are qualified to reach, and because the affidavits are conclusory.

Whether the Code Enforcement Officers are duly authorized designees is a close question given the paucity of the record. The affidavits of Arnold and Kerr, however, provide evidence for the proposition that the Code Enforcement Officers were authorized by Arnold to issue Emergency Vacate Orders as his representatives. In addition, although the Columbus City Code repeatedly refers to directors and their "designees," it never mentions a written or formal requirement for the designation of authority. An informal or verbal designation appears to have been sufficient. We therefore conclude that the district court did not err in determining that the Code Enforcement Officers were authorized to issue Emergency Vacate Orders.

**C.      The district court did not err in refusing to enter summary judgment in favor of the plaintiffs**

The plaintiffs next argue that the district court incorrectly refused to grant their summary judgment motion against the city and against the individual defendants. In support of this claim, the plaintiffs repeat nearly every argument considered by both the district court and by *Sell I*.

With regard to the plaintiffs' claims against the individual defendants, the district court correctly rejected the plaintiffs' motion because they were unable to prove, as a matter of law, that the defendants violated the plaintiffs' alleged right to a pre-eviction hearing. The district court did err, however, in granting summary judgment on the basis that the individual defendants were entitled to qualified immunity. This issue is discussed at greater length below.

-11-

With regard to the plaintiffs' claims against the City of Columbus, the district court determined that the claims raised genuine issues of material fact that precluded the granting of summary judgment. The question of the city's liability was therefore presented to the jury, which rendered a verdict in favor of the city. In circumstances like this, "where summary judgment is denied and the movant subsequently loses after a full trial on the merits, the denial of summary judgment may not be appealed." *Jarrett v. Epperly*, 896 F.2d 1013, 1016 (6th Cir. 1990). This ruling is based on the principle "that the potential injustice of allowing the improper denial of a motion for summary judgment is outweighed by the injustice of 'depriv[ing] a party of a jury verdict after the evidence was fully presented . . . .'" *Paschal v. Flagstar Bank, FSB*, 295 F.3d 565, 570-71 (6th Cir. 2002) (quoting *Jarrett*, 896 F.2d at 1016 n.1). The plaintiffs therefore may not appeal the denial of their motion for summary judgment.

Even considering the merits of the plaintiffs' appeal, the district court did not err in denying their summary judgment motion. Taking the facts in the light most favorable to the defendants, the plaintiffs would have been unable to demonstrate as a matter of law that (1) the Code Enforcement Officers were unauthorized to issue the Emergency Vacate Order, (2) the City of Columbus failed to adequately train the Code Enforcement Officers in issuing Emergency Vacate Orders, and (3) the plaintiffs suffered a deprivation of their constitutional rights. Factual questions surrounded these issues, and summary judgment was therefore inappropriate.

**D.      The district court erred in concluding that the individual officers were entitled to qualified immunity as a matter of law, but this error proved harmless**

The plaintiffs further allege that Code Enforcement Officers Arnold, Bartley, Cross, and Reed violated the plaintiffs' Fourth and Fifth Amendment rights by ordering them out of their home in advance of a pre-eviction hearing. This argument was rejected early on by the district court, which granted the defendants summary judgment on the basis of qualified immunity. *Sell I* reversed. It found that further factfinding was necessary to determine whether the officers had considered other alternatives before issuing the Emergency Vacate Order. On remand, the district court once again held that the officers were entitled to qualified immunity as a matter of law. The court found that the "officers did consider less drastic options prior to concluding that immediate eviction was necessary to protect Plaintiffs' health."

In evaluating the district court's decision on this issue, we start with the proposition that even if a plaintiff's due process rights are violated, municipal officers are entitled to immunity unless their conduct "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether a defendant may avail himself of qualified immunity involves a three-step inquiry:

> First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc) (relying on *Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)). Moreover, "[i]f the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal

developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818. Qualified immunity will therefore "be defeated [only] if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury . . . .'" *Id.* at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975) (second alteration in the original)).

The key questions in the present case are (1) whether the alleged right in question—the right to a pre-eviction hearing before being displaced from one's home due to potentially dangerous circumstances—was clearly established, and (2) whether the Code Enforcement Officers should have known that evicting the plaintiffs violated this constitutional right. With regard to the first factor, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id.*

One of the few cases delineating the right to a pre-eviction hearing provides that "[a] prior hearing is not constitutionally required where there is a special need for very prompt action to secure an important public interest and where a government official is responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in a particular instance." *Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994) (citing *Fuentes v. Shevin*, 407 U.S. 67, 91 (1972)). In *Flatford*, for example, the city building commissioner asserted the defense of qualified immunity after he evacuated tenants from an apartment building found to have

faulty wiring. The dispositive issue in the case was "whether [the defendant's] conclusion that an emergency situation existed was an objectively unreasonable decision in light of the information he then possessed, construing the evidence in a light most favorable to the [plaintiffs]." *Id.* In answering the question in the negative, the court found that qualified immunity was appropriate, and that it operated to "avoid[] over-deterring officials where their duties legitimately require action in situations not implicating clearly established rights." *Id*. at 168; *see also Mitchell v. City of Cleveland*, No. 97-4206, 1998 WL 898872 (6th Cir. Dec. 17, 1998) (unpublished) (applying *Flatford* and declining to find a constitutional violation in the evacuation of a residence plagued with numerous housing-code violations).

*Sell I* instructed the district court on remand to further examine the question of whether the Code Enforcement Officers considered available alternatives before ordering the immediate evacuation of the plaintiffs. In particular, this court noted that

> [i]t is quite possible that a reasonable Code Enforcement Officer, after giving the matter due consideration, could conclude that the unsanitary conditions in the Sell and Cuckler home posed such an extreme risk to the health and safety of the two elderly residents that there was not time to order abatement of the unsanitary conditions or hold a pre-eviction hearing. But it is unclear if Cross, Arnold, and the other Code Enforcement Officers engaged in this sort of analysis.

*Sell I*, 2002 WL 2027113 at *12. The court further determined that the record was unclear as to whether the Code Enforcement Officers behaved the way they did "because they reasonably believed an emergency eviction without awaiting even an expedited hearing was necessary under the circumstances to protect plaintiffs' health and safety, or because they never considered the

constitutional and statutory limitations on evictions without a hearing." *Id.* In remanding the case, the court instructed the district court to conduct further factfinding on this particular issue.

In response to *Sell I*, the defendants submitted affidavits explaining their rationales in the moments leading up to the decision to issue an Emergency Vacate Order. Defendant Cross, for example, provided the following explanation:

> I considered other enforcement possibilities before concluding that an 'immediate vacate' was necessary. I considered issuing a notice of violation and allowing some time to clean the residence. There were a number of factors that, I believed precluded me from taking such action. The health of the two residents was an issue. Ms. Sell told me that she had been ill for four days and, as I recall, she told me her mother was ill. The age of the residents was also taken into consideration. The extent of the unsanitary conditions, the immediate risk to health that I believed was present, and the apparent inability of the residents to address the unsanitary conditions (I was there for several hours and no effort was made to address the unsanitary conditions) all weighed against a notice of violation with some time to address the health risk.

Although the defendants' responses directly address *Sell I*'s concerns, they do not establish as a matter of law that the officers acted reasonably in evicting the plaintiffs without a pre-eviction hearing. Per *Flatford, Fuentes*, and *Mitchell*, the law at the time of the eviction was clear that a pre-eviction hearing was not required where immediate evacuation "was necessary and justified in a particular instance." *Flatford*, 17 F.3d at 167. But whether the conditions at the plaintiffs' residence rose to the level of creating a situation where an evacuation would be "necessary and justified" is a factual question that had not yet been developed. The district court, in its order, restricted its inquiry to whether a reasonable Code Enforcement Officer would have been aware that his conduct was illegal. This inquiry, however, turns on the factual question of how severe were the conditions the Code Enforcement Officers encountered at the plaintiffs' residence.

Indeed, the record contains a contradictory mix of facts. The plaintiffs, for example, claim that their residence was never so filthy as to require immediate evacuation. In support, they point to the testimony of Carol Baldauf, an employee with a Cincinnati welfare organization, who was at the plaintiffs' house on the morning they were evicted. She testified that, while the house seemed "cluttered," she saw no signs of filth or of soiling. Baldauf also stated that she did not see any feces on the floor, thus contradicting the testimony of the Code Enforcement Officers. The plaintiffs also note the visit by Dr. Lautzenheiser, the Public Health Veterinarian for the City of Columbus. He had visited the house a few weeks before the eviction, and also stated that he saw nothing that would indicate a serious emergency. To the contrary, he explicitly noted that the house appeared to be clean and that there were no unsanitary conditions. The Code Enforcement Officers, on the other hand, testified that the residence was in need of immediate evacuation. Cross's testimony, for example, directly contradicted Baldauf's. He noted feces on the floor, as well as trash and debris. Cross also testified to an "overwhelming smell of urine."

Given this conflicting evidence, we have a case where "the jury becomes the final arbiter of [the officer's] claim of immunity . . . ." *Brandenburg v. Cureton*, 882 F.2d 211, 215-16 (6th Cir. 1989). Qualified immunity is ultimately a question of law properly addressed by the judge, but a jury trial is nonetheless necessary where, as here, "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Id.* at 216.

The question before us is complicated, however, by the fact that the district court did in fact conduct a jury trial on the plaintiffs' claims against the City of Columbus. In that trial, the jury was explicitly asked whether the plaintiffs' due process rights were violated and, in particular, whether

"an emergency existed, and [whether an] immediate vacation of the premises [was] necessary to protect the plaintiffs' health and safety . . . ." The jury returned a verdict for the city, unanimously agreeing that the Code Enforcement Officers did not "violate Plaintiffs' constitutional due process rights by ordering an immediate vacation of the premises."

In light of this finding by the jury, the question becomes whether the grant of qualified immunity was harmless error. *See* Fed. R. Civ. P. 61 (defining "harmless error" as an error or defect in a proceeding that does not "affect the substantial rights of the parties."). The jury considered the same question with regard to the City of Columbus as it would have considered with regard to the Code Enforcement Officers. Its implicit finding that the defendants had demonstrated that "an emergency existed, and [an] immediate vacation of the premises [was] necessary" leads to the conclusion that the individual defendants were indeed entitled to the defense of qualified immunity.

The district court's grant of qualified immunity to the individual defendants, in sum, was erroneous. But in light of the jury's verdict in favor of the City of Columbus, we conclude that the grant of qualified immunity was a harmless error.

**E.      The district court did not abuse its discretion in its choice of jury instructions**

Finally, the plaintiffs argue that the instructions given by the district court were constitutionally deficient and failed to articulate the appropriate standard by which emergency evictions are measured. They further claim that the district court erred when it instructed the jury as to what constitutes deliberate indifference.

This court reviews a district court's choice of jury instructions for an abuse of discretion. *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001). The trial court has broad discretion in

determining what kind of language will be included in a jury instruction. *Id.* An abuse of discretion

will not be found unless "the instructions, viewed as a whole, were confusing, misleading, or

prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990)).

The contested section of the jury instructions reads as follows:

> You . . . need to decide whether one or more of the code enforcement officers violated plaintiffs' due process rights when they ordered an immediate vacation of the premises . . . . The Fourteenth Amendment to the Constitution of the United States prohibits the government from depriving individuals of their property without due process of law. And as I told you earlier, this means that as a general rule, the government must provide a notice and an opportunity for a hearing before it removes persons from their homes. However, there is an exception to this rule. In certain extraordinary situations, immediate vacation of the premises is justified. A prior hearing is not Constitutionally required where there is a special need for very prompt action to secure an important public interest and where a government official is responsible for determining, under the standards of a narrowly drawn statute or ordinance, that immediate vacation is necessary and justified in a particular instance.
>
> . . .
>
> So [Columbus City Code § 4506.06(b)] sets forth two requirements that must be satisfied before a code enforcement officer can order that the premises be vacated without first providing an opportunity for a hearing. First, an emergency must exist in an occupied building. *An emergency is a set of circumstances demanding immediate action, but not all emergencies require that the premises be immediately vacated. The second requirement is that immediate vacation of the premises is, quote, necessary to protect the public health and safety or the health and safety of any person, end quote.* And, again, the burden is on the City of Columbus to prove by a preponderance of the evidence that both of these conditions were met.

(Emphasis added.)

The plaintiffs argue that the instructions completely "abandon[] the requirement that the

eviction must be justified, in addition to being necessary." They also claim that, under the district

court's instructions, an "emergency" could last for days and that the district court's explanation that

"not all emergencies require that the premises be immediately vacated" is at odds with *Flatford v.*

*City of Monroe*, 17 F.3d 162 (6th Cir. 1994).

But the jury instructions, taken as a whole, required the jury to find that an emergency

existed *and* that an immediate evacuation was necessary to protect the health and safety of either the

public or the residents. This comports squarely with the ruling that "[a] prior hearing is not

constitutionally required where there is a special need for very prompt action [and immediate

evacuation] was *necessary and justified* in a particular instance." *Flatford*, 17 F.3d at 167 (citing

*Fuentes v. Shevin*, 407 U.S. 67, 91 (1972) (emphasis added)). As such, the jury instructions were

not confusing, misleading, or prejudicial. The wording of the instructions might not have been to

the plaintiffs' exact liking, but this does not mean that the district court abused its discretion.

Sell and Cuckler further contend that the district court erred when it instructed the jury on

the city's alleged deliberate indifference in failing to properly train the Code Enforcement Officers.

The jury, however, never reached this question, finding instead that the Code Enforcement Officers

did not violate the plaintiffs' due process rights in the first place. As such, we have no need to

address this argument.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.