NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0405n.06

No. 20-1552

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

EPAZZ, INC.,                                    )
                                               )
        Plaintiff,                             )
                                               )
JADIAN, INC.,                                   )
                                               )
        Plaintiff-Appellant,                    )
                                               )
v.                                              )        ON APPEAL FROM THE
                                               )        UNITED STATES DISTRICT
NATIONAL QUALITY ASSURANCE USA, INC.,           )        COURT FOR THE WESTERN
                                               )        DISTRICT OF MICHIGAN
        Defendant-Appellee,                     )
                                               )
WILLIAM A. ALLISON; JOSEPH J. NAGEL,            )
                                               )
        Defendants.                            )
                                               )

FILED
Aug 26, 2021
DEBORAH S. HUNT, Clerk

Before: BOGGS, MOORE, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. This is a messy business dispute between National Quality Assurance USA, Inc. (NQA) and Jadian, Inc. (Jadian). Jadian's predecessor, Jadian Enterprises (Enterprises), owned a software package called Enterprise Quality Manager (EQM). For years, Enterprises licensed this program to NQA. The software was uniquely prone to bugs, crashes, and technical failures. But Enterprises was able to provide intensive and persistent technical support to keep things afloat. And so Enterprises and NQA developed a solid, working relationship.

Then Jadian entered the picture. It bought out Enterprises' assets and quickly displayed its incapacity to provide meaningful support for EQM. Dissatisfied with the new regime, NQA

withheld payment until Jadian showed that it could meet its contractual support obligations. In response, Jadian refused to provide any support until NQA paid up in full. The parties found themselves in a standoff, and the relationship quickly crumbled.

Three years later, Jadian brought this action against NQA, alleging breach of contract and trade-secret misappropriation, among other claims. NQA denied liability and counterclaimed, also alleging breach of contract. The district court granted summary judgment for NQA on Jadian's trade-secret claims. And, following a bench trial, the court found in NQA's favor on all of the contract claims. For the reasons stated below, we AFFIRM the district court's judgment.

I.

A.

NQA provides, among other services, quality and environment-management-system registration and certification services for its clients. As a key part of this operation, it has long used EQM, a software package formerly owned by Enterprises. "The EQM software enables NQA to manage compliance electronically; conduct audits and inspections; fulfill work orders and deliver invoices; monitor licensing, certifications and permits; and check compliance enforcement." NQA's auditor manager, Peter Theobald, explained that EQM was a "critical application" for his company. But despite its importance, EQM "was not a stable platform" and "needed constant maintenance and support."

Even though NQA and Enterprises had to communicate almost daily to work out the inevitable and incessant issues with EQM, their "relationship was very solid and very trusting." Two of Enterprises' software developers—Joseph Nagel and Bill Allison—were primarily responsible for providing the critical support to NQA. Enterprises' Chief Technology Officer, Guy Metz, would also provide some "high-level" support "[o]n occasion."

Nevertheless, Enterprises was a "relatively small company compared to NQA" and had only a handful of employees. So, due to the "mission-critical" nature of the EQM software, NQA needed some assurance in the event Enterprises "couldn't perform" or "keep up" with the service levels NQA demanded. It needed the ability to keep the train rolling so to speak—"to maintain the software program and make modifications or changes to that program as needed." *Jadian, Inc. v. Nat'l Quality Assurance USA, Inc.*, No. 1:17-cv-907, 2020 WL 3071756, at *2 (W.D. Mich. June 10, 2020).

To that end, the parties executed an Escrow Agreement in late 2008 with Iron Mountain Intellectual Property Management, Inc. (Iron Mountain). The idea was simple enough. Enterprises would periodically deliver its EQM source code to Iron Mountain. And, in turn, NQA would pay Iron Mountain to retain the source code, keep it safe, and release it to NQA if Enterprises: (1) "breach[ed] . . . the license agreement or other agreement" between it and NQA "regulating the use of [EQM]," (2) failed "to function as a going concern or to operate in the ordinary course," or (3) went bankrupt. Following any of these triggering conditions, NQA had the right to submit a "Work Request" to Iron Mountain. If Enterprises did not respond within ten days after Iron Mountain mailed the Work Request to the address on file, Iron Mountain would release the code, and NQA would receive "the right . . . to use the Deposit Material for the sole purpose of continuing the benefits afforded to [it] by the License Agreement."

For the next few years, things proceeded well enough. And in January 2012, Enterprises and NQA entered into a Master Subscription Agreement (MSA). That agreement required NQA to pay Enterprises quarterly subscription fees. And based on the formula in the MSA, those fees ranged from $45,000 per year in 2012 to $50,000 per year in 2014. It is undisputed that NQA paid all of its subscription fees through June 30, 2014.

In exchange for these fees, Enterprises had to do more than just allow NQA to use the EQM software. As relevant here, the MSA required Enterprises to: (1) provide "basic support" for EQM, (2) "use commercially reasonable efforts to make [EQM] available 24 hours a day, 7 days a week," and (3) "use all reasonable commercial endeavors to correct any critical non-conformance promptly, or provide [NQA] with an alternative means of accomplishing the desired performance."

Alongside the MSA arrangement, Enterprises also agreed to develop three special software projects for NQA. NQA fully paid for each of the projects (for a total of $58,350) in advance. But Enterprises had not delivered on any of them by May 2014.

B.

May 2014 was when things started to go south—and quickly. That's when Enterprises sold all of its assets and customer contracts to Jadian, a wholly-owned subsidiary of Epazz, Inc. At the time, NQA was Enterprises' largest and "single most important customer," accounting for approximately forty percent of its annual revenues. *Id.* at *5. But in the words of Enterprises' President Jerry Norris, Jadian did not have a "solid" transition plan to "somehow replicate the magic that was happening between [Enterprises] and [its] customers." The district court put it more bluntly: Jadian "totally fumbled the handoff."

Prior to the closing on May 9, Jadian was aware that NQA was Enterprises' largest client and revenue source. Yet Jadian did not contact NQA prior to the close. Nor did it request that Enterprises introduce Jadian to NQA after the sale. For its part, Enterprises informed Jadian that Allison and Nagel provided EQM support for NQA. But Jadian did not hire either developer "even though they were critical to the day-to-day operation of the software and management of the

relationship." *Id.* Jadian waited until the day before closing to even speak with Nagel and Allison, neither of whom provided any training to Jadian's employees concerning the EQM software.

Without Allison or Nagel onboard, Jadian "had no workable transition plan to shift support operations from Enterprises to Jadian." *Id.* Instead, Jadian hired Guy Metz for six months and paid Jerry Norris as a contractor for a short time. Neither could "do the work of Allison or Nagel, but they were supposed to train Jadian's own developers, located overseas, on managing and developing the EQM software." *Id.* Norris testified that Jadian's support team in Afghanistan was not "effective," and its members "would change quickly and often." Even Epazz's President, Shaun Passley, tacitly admitted that the support team was "unfamiliar[]" with the EQM software and "didn't know how to fix it" at the time of the transition; the team would need additional time to figure it out.

That was a major problem for NQA. Theobald testified that he and his team had serious concerns as to whether they would still "be able to maintain this mission-critical application" and whether they would "have that level of interaction" and ongoing support that was necessary to sustain EQM. On May 12, Theobald communicated NQA's "level of uncertainty" and "serious concern" to Jadian and asked that it "provide as a matter of urgency some documentation detailing what the transition process is for ongoing support of the EQM system." He also asked for a "go forward plan" on the projects. Clearly frazzled, Theobald sent a follow-up email later that day pleading for answers. Karen Griggs—who "assisted in the management of" Enterprises but was not a software developer—was brought on as a consultant for Jadian and responded that Jadian was "looking into issues you raised and creating a plan to discuss with you / your team." Theobald wasn't comforted in the slightest; in his view, "there should have been a plan already."

"The inadequacy of Jadian's transition plan was made clear two days later . . . ." *Id.* at *6. One of the functions of the EQM software was to send invoices to NQA's clients. But on May 14, NQA reported to Jadian that approximately 1,000 of its invoices were not emailed to clients. This was a "significant problem" for NQA, because it affected "a million and a half or a million plus dollars' worth" of cash flow, "a huge amount of money to a small company." Accordingly, Theobald called Karen Griggs, and NQA's accounting manager emailed Griggs saying that NQA "need[ed] this issue resolved IMMEDIATELY." Griggs forwarded the message to Metz and the support team, explaining that it was an "emergency situation" that was "a VERY high priority for our customer NQA." Late that afternoon, Griggs responded to NQA that "the support team is working on your issue currently with the goal of having it resolved today."

But Jadian "was unable to provide a fix by the end of the day, or indeed the next day." *Id.* On May 16, Theobald sent Jadian another email stressing the importance of resolving the issue. He also brought Nagel—then unemployed—into the conversation to see if he could help explain things to Metz and the support team. As Theobald testified, the issue "was way below [Metz]'s understanding. So he really had never looked at any of this. . . . He's a blank canvas. He doesn't even know where to start." The day came and went. Still no fix.

At this point, "panic" set in for NQA. Theobald approached Metz and insisted: "We need Bill [Allison]. . . . [H]e's the only guy that's going to be able to fix this." But Jadian did not bring Allison on to fix the problem. "Ultimately it was NQA—three days after it made its first report to Jadian—that brought on Bill Allison at its own expense to look at the invoicing issue." *Id.* Allison was able to provide a temporary fix that evening and a permanent fix a few days later. NQA paid Allison $1,800 for his work and submitted the bill to Jadian, but Jadian refused to pay.

Unfortunately, the invoicing issue was only the start. On May 17, Theobald emailed Jadian's support team telling them that "[t]he production site is down[.] [O]ften this [i]s just a matter of resetting the server, please fix ASAP, this is EXTREMELY URGENT!!!!! If you can't fix this within the hour or don't know what to do please ask Bill [Allison] for help." An hour later and with no response from Jadian, another NQA employee, Chris Coomey, figured out how to fix the issue. But along the way, he discovered that the domain used by 95% of NQA's users was no longer being serviced and users were being directed to a splash page that said the website would be back up by January 6, 2014. Theobald was outraged and fired off an email to Jadian's support team: "What is this? Before we couldn't access the site, now we just look like idiots, what exactly are you doing? And at some point is anyone going to respond to me, this is APPALLING customer service." Metz fixed the issue later that afternoon.

Apparently due to an oversight in the domain fix, the NQA client portal became inaccessible to NQA's clients. Theobald told Jadian's support team that this was an "extremely serious" issue because several "very large client[s]" depended on the portal. While Jadian eventually fixed the problem, NQA's concerns only intensified.

On May 27, Passley finally held a meeting with NQA. But the notes from that meeting "reflect that Jadian still was not ready to provide basic EQM software support." *Id.* at *7. Although Passley stated that his developers were "reviewing the code" and would be able to "provide development resource[s] in the next few weeks," Theobald expressed his concern as to Jadian's ability "to assist NQA in the short term, especially in light of the recent [problems]." Theobald also noted that NQA had approximately thirty unfulfilled support tasks.

For the next couple of months, the parties held weekly meetings "to discuss Jadian's progress, if any, responding to NQA's request[s] for software support and development." The

district court found that those meetings "ma[d]e clear that Jadian's faulty transition plan meant that there was no real prospect Jadian would ever be able to provide the support that NQA needed for EQM." *Id.* The record bears this out, as Jadian's failures to fulfill its support obligations piled up into July.

To make matters worse, "all sides understood that Jadian—for good or ill—undertook the obligation to deliver the [three special] projects and knew that the projects were due under accepted and prepaid purchase orders." *Id.* at *9. The projects were often discussed at the weekly meetings, but the district court found that "Jadian never delivered them." *Id.*

In light of Jadian's service failures, NQA refused to pay the subscription fee for the quarter beginning on July 1, 2014. And the next day, it sent a formal "Cure Notice" to Passley. NQA referenced the license agreements superseded by the MSA and explained that:

> Jadian has historically been a very supportive partner in [NQA]'s business and has usually been very prompt with their deliveries over the past nine years. Jadian's service performance has declined well below acceptable limits over the past four months. Notification of this unacceptable performance was made to Jadian's owner and staff on May 27, 2014, which will serve as the date of notice of default . . . . Despite this notification, and numerous subsequent discussions, there has been no improvement in performance.

The letter concluded by informing Jadian that "NQA will resume normal payments for Product Support Services" once Jadian remedied its delinquencies, including its failed support obligations.

Passley responded that the "Master Subscription Agreement, Project Service Agreement[,] and Escrow Agreement" were the "current agreements that are in effect." He also demanded payment from NQA for subscription fees.

So NQA followed up with a second letter. This time, it referenced the MSA as well. The letter pointed out some of Jadian's failures and emphasized that:

> [T]here has been no perceptible activity on the part of Jadian to complete the outstanding efforts for which we have fully paid, or to comply with the terms of our

contracts. We do not believe that any negotiation is required or desired. Our demands are simple, lawful[,] and proper. We demand timely performance from Jadian in exact accordance with the contracts. Any failure of Jadian to do so is a repudiation of the contracts and places them in further DEFAULT. [NQA] is fully prepared to immediately meet its contractual financial obligations under the various contracts when Jadian meets its contractual performance obligations. It is just that simple.

Then the bad blood boiled over. After NQA reported another "extremely critical" issue with the EQM software, Jadian responded on July 28 "that the development team will not be working on support issues until payment is received. The developer will be focusing on the three projects that need to be completed." Jadian continued to send invoices to NQA through 2017. NQA did not pay the subscription fees. And Jadian did not provide NQA with any services.

A month after the falling out, NQA followed the process set forth in the Escrow Agreement and sent Iron Mountain a request for the EQM source code. Though Kim Griggs was still working for Jadian as a consultant, at no time did she or Passley notify Iron Mountain of the assignment of the Escrow Agreement to Jadian or provide Iron Mountain with an updated address. Neither Enterprises nor Jadian responded to Iron Mountain's notice. And, pursuant to the terms of the Escrow Agreement, Iron Mountain released the source code to NQA.

A few months later, NQA engaged CABEM Technologies, Inc. (CABEM), "to provide EQM software development and support similar to the basic support that Jadian was supposed to provide under the MSA." *Id.* at *10. The NQA/CABEM contract included a provision prohibiting CABEM from disclosing "details regarding the [EQM] software" to "any third party."

By this point, all meaningful communications between Jadian and NQA had ceased.

## C.

Almost three years later, Epazz and Jadian brought the present action against NQA. In its answer, NQA asserted its own contract and quasi-contract counterclaims. The district court

dismissed Jadian's tortious-interference claim, granted summary judgment to NQA on Jadian's trade-secret-misappropriation claim, and dismissed most of the parties' remaining claims.

That left the parties' respective breach-of-contract claims for trial. In Jadian's view, NQA materially breached the MSA when it refused to pay the invoices after June 30, 2014, and when it obtained and used the source code from Iron Mountain without continuing to pay subscription fees. NQA, by contrast, argued that it was Jadian who failed to live up to its end of the bargain when it failed to provide the requisite level of support in May and June of 2014. Thus, NQA believed that it was fully justified in withholding payment and in invoking the Escrow Agreement in order to obtain the EQM source code.

The case proceeded to a three-day bench trial on the contract claims. The district court concluded that "[t]he preponderance of the evidence points overwhelmingly to the conclusion that Jadian committed the first substantial breach of the MSA." *Id.* at *13. It furthermore found that "NQA was within its rights under the Escrow Agreement to request the EQM source code from Iron Mountain. And once NQA received the source code, it was able to use the source code to continue the benefits of the 'mission critical' EQM software." *Id.* at *16. The court entered judgment in NQA's favor on all remaining claims and awarded NQA $58,350 in damages for Jadian's failure to complete the three projects.

One last point to note. After the close of discovery and the court's summary-judgment ruling, NQA moved *in limine* to exclude evidence at trial concerning most of the damages Jadian alleged in its initial Rule 26 disclosure. NQA claimed that Jadian had "failed to provide any documentary support explaining [its] calculation of the purported damages" during discovery.[1] In

---

[1] Rule 26 requires a party, "without awaiting a discovery request," to provide the opposing party with "a computation of each category of damages claimed" as well as "the documents or other evidentiary material . . . on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii).

response, Jadian filed a "Supplemental Damages Disclosure." The district court initially withheld judgment on NQA's motion. But in its posttrial ruling, the court sustained NQA's objection, finding that Jadian's supplemental disclosure represented "a complete shift in the claimed basis for recovery." *Id.* at *18. The court then concluded that "even if the Jadian theory of damages that was presented [in the supplemental disclosure] is considered," none of those damages had "been established by a preponderance of the evidence." *Id.* at *19.

Jadian timely appealed.

## II.

We review a district court's legal conclusions following a bench trial de novo. *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir. 2008). However, the district court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). A factual finding is clearly erroneous only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "This is so even when the district court's findings do not rest on credibility determinations . . . ." *Id.* at 574.

The parties agree that the breach-of-contract claims in this case are governed by Michigan law. In Michigan, "[a] party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).

A.

We start with Jadian's contract claims. "As the appellant, [Jadian] must confront the district court's reasons for dismissing [its] claims and explain why the court was wrong." *Castellon-Vogel v. Int'l Paper Co.*, 829 F. App'x 100, 102 (6th Cir. 2020) (citing *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019)). Here, though, Jadian has entirely failed to appeal one of the district court's dispositive bases for ruling against it.

Specifically, the district court found that "[e]ven if Jadian could succeed on any contractual theory of liability," it had "failed to establish damages necessary to make out its breach of contract claim." *Jadian*, 2020 WL 3071756, at \*17. Jadian has provided nothing in its brief to refute that assessment. In fact, even after NQA pointed out Jadian's failure to appeal this dispositive finding, Jadian offered no response in its reply. That silence dooms Jadian's appeal. *See Stewart v. IHT Ins. Agency Grp.*, 990 F.3d 455, 456 (6th Cir.) ("When a district court provides two alternative grounds for its decision, the losing party must challenge each ground on appeal to change the outcome."), *petition for cert. filed*, No. 21-208 (U.S. Aug. 2, 2021).

To be sure, Jadian argued that the district court abused its discretion in ruling that Jadian could not use a supplemental damages theory that it had first revealed after the close of discovery. But even if the district court erred in that respect, Jadian "cannot prevail." *Id.* at 457. The district court first held that there was a "total failure of proofs on the [initially] disclosed damages theory." *Jadian*, 2020 WL 3071756, at \*17. Jadian does not contest this finding. Turning to the theory in the supplemental disclosure—which Jadian was permitted to pursue at trial—the district court agreed with NQA that Jadian shouldn't be able to advance this tardy and "entirely separate theory of damages." *Id.* at \*18; *see* Fed. R. Civ. P. 37(c)(1). But it nevertheless held that "even if the Jadian theory of damages that was presented at trial is considered," Jadian had not "established

[those damages] by a preponderance of the evidence." *Jadian*, 2020 WL 3071756, at *19. Thus, the district court considered and rejected Jadian's supplemental damages theory too. And once again, Jadian does not contest this ruling on appeal. That "render[s] irrelevant the merit of the issue[s] the plaintiff[] did raise" as to its contract claims. *Rees v. W.M. Barr & Co.*, 736 F. App'x 119, 125 (6th Cir. 2018); *see Stewart*, 990 F.3d at 457; *Scott*, 936 F.3d at 522–23. Those issues simply do not matter if Jadian cannot prove damages, *see Miller-Davis Co.*, 848 N.W.2d at 104, as the district court found for *both* of Jadian's damages theories. So we must affirm with respect to Jadian's contract claims.

B.

Turning to NQA's counterclaims, Jadian fares no better. The district court held that Jadian was liable to NQA for $58,350—the amount NQA prepaid for the undelivered projects—because "all parties treated these three development projects as part of the contractual commitment to NQA." *Jadian*, 2020 WL 3071756, at *19, *21.

"Generally, when one corporation sells its assets to another, the purchaser is not responsible for the debts and liabilities of the selling corporation." *Antiphon, Inc. v. LEP Transp., Inc.*, 454 N.W.2d 222, 224 (Mich. Ct. App. 1990). But the Michigan courts have recognized a number of exceptions to this rule. *See id.* at 224–25. One exception is "where there is an express or implied assumption of liability" by the purchasing corporation. *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 509 (Mich. 1999) (quotation marks omitted); *see Antiphon*, 454 N.W.2d at 225.

Here, the district court found that "the conduct or representations relied upon by [NQA] indicate an intention on the part of" Jadian to deliver the projects. *Jadian*, 2020 WL 3071756, at *19 (quoting *Antiphon*, 454 N.W.2d at 225). That finding was not clearly erroneous. Immediately after the sale, Theobald reached out to Jadian, asking for a "go forward plan" on all three projects.

And everyone understood from Jadian's subsequent conduct that it had agreed to take those projects on. As the district court observed, the weekly meeting notes from both sides "consistently document Jadian's efforts to continue work on the projects; give updates to NQA; and to provide assurances that the projects would be eventually delivered." *Id.* Thus, "the facts demonstrate that there existed an implied agreement to assume liability" for the completion of the projects. *Antiphon*, 454 N.W.2d at 225; *see also Traverse City Auto Mall v. Wolverine Auto Supply, Inc.*, Nos. 226824, 227554, 2002 WL 1797252, at \*2 (Mich. Ct. App. Aug. 2, 2002) (per curiam).[2]

In response, Jadian points to a July 7 email where Passley said the "projects will remain on [Jadian's] test server until [it] receive[s] payment." But this lone email does not show that the district court clearly erred in finding that Jadian "undertook the obligation to deliver the projects and knew that the projects were due under accepted and prepaid purchase orders." *Jadian*, 2020 WL 3071756, at \*9. Passley acknowledged in the very same paragraph that Jadian "will finish the projects that have been paid for." And the email was sent more than a month after Jadian had repeatedly assured NQA that it would finish the projects—by which point Enterprises' employees had all left and the corporation had dissolved.

Jadian next raises four affirmative defenses. Yet the first three—statute of limitations, statute of frauds, and the voluntary-payment doctrine—were not raised until after trial. That's a problem for Jadian. "As a general rule, failure to plead an affirmative defense results in a waiver

---

[2] In its reply brief, Jadian says that NQA "cannot show any detrimental reliance," which it claims "is an element under the implied assumption theory." But Jadian did not raise this argument either in its trial briefs or in its opening brief on appeal. "Time, time, and time again, we have reminded litigants that we will treat an argument as forfeited when it [is] not raised in the opening brief." *Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (quotation marks omitted). We follow suit here. NQA was "not able to respond to the merits" of Jadian's belated argument or attempt to show how it may have detrimentally relied on Jadian's assurances, and so "we decline to resolve this issue that was not fully briefed." *Lyons v. Mich. Dep't of Corr.*, 812 F. App'x 305, 309 (6th Cir. 2020).

of that defense." *Old Line Life Ins. Co. of Am. v. Garcia*, 418 F.3d 546, 550 (6th Cir. 2005). And Jadian offers no reason why it could not have raised these defenses earlier. Indeed, all three of them were conspicuously absent from the pretrial order, which listed other defenses among the twenty-one remaining issues for the district court's resolution. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived . . . ." (first alteration in original) (quotation marks omitted)); *Ordos City Hawtai Autobody Co. v. Dimond Rigging Co.*, 695 F. App'x 864, 875 (6th Cir. 2017) ("[P]arties generally forfeit claims or defenses not raised in the final pretrial order."). As such, the district court did not abuse its discretion in refusing to consider these belatedly raised defenses. *See Ghandi v. Police Dep't of Detroit*, 823 F.2d 959, 962 (6th Cir. 1987) ("[A]n attempt to pursue any issue not listed in the order may be rejected by the trial court." (quotation marks omitted)).

Jadian appears to raise a laches defense as well. Unlike the other three affirmative defenses, Jadian did raise laches in its answer to NQA's counterclaims. Nonetheless, the laches defense wasn't included in the pretrial order, so Jadian has forfeited its laches defense too. *See Ordos City*, 695 F. App'x at 875. In any event, the laches defense fails on the merits. "For laches to apply, inexcusable delay in bringing suit must have resulted in prejudice." *Tenneco Inc. v. Amerisure Mut. Ins. Co.*, 761 N.W.2d 846, 864 (Mich. Ct. App. 2008). Jadian doesn't even attempt to show such prejudice.

## C.

Finally, we confront Jadian's trade-secret claims. In its summary-judgment ruling, the district court found that NQA properly followed the Escrow Agreement's procedures for obtaining the source code from Iron Mountain. And, because Iron Mountain's release of the source code gave NQA a contractual right to use the code, Jadian could not show misappropriation "within the

meaning of the [trade-secret] statute," even if NQA "subsequently used the source code in a way that [ran] counter to the MSA." This, the district court said, was "a contractual issue, not a trade secret theory." And so too was the question whether Jadian had breached the MSA, such that NQA had a right to request the code in the first place. The court acknowledged that factual issues remained as to these contract-related questions, but it granted summary judgment in NQA's favor, reasoning that allowing the trade-secret claims to proceed "would improperly blur the line between contract and tort."

Jadian contends that "the breach of a contractual use or disclosure restriction constitutes misappropriation" and that the district court erred in concluding otherwise. But, even assuming Jadian is correct, any error in the district court's grant of summary judgment was rendered harmless by its posttrial ruling. *See* Fed. R. Civ. P. 61. That's because the court's subsequent factual findings show that it "would, as a matter of logical necessity, have rejected" Jadian's trade-secret claims after trial. *Gross v. Weingarten*, 217 F.3d 208, 220 (4th Cir. 2000); *see also Abbasid, Inc. v. First Nat'l Bank of Santa Fe*, 666 F.3d 691, 696 (10th Cir. 2012); *Brandt v. Wand Partners*, 242 F.3d 6, 16 (1st Cir. 2001); *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994); *Sell v. City of Columbus*, 127 F. App'x 754, 764 (6th Cir. 2005).

Start with whether NQA could obtain the source code. The Escrow Agreement permitted NQA to submit a Work Request if Jadian "breach[ed] . . . the license agreement" between it and NQA "regulating the use of [EQM]." And the district court found that, "[b]ased on Jadian's breach of the MSA, NQA was within its rights under the Escrow Agreement to request the EQM source code." *Jadian*, 2020 WL 3071756, at *16. We see no clear error in that finding. The record plainly reveals "a pattern of events" manifesting Jadian's "basic incapacity to provide any meaningful support for EQM." *Id.* at *14. And it shows that for nearly every support issue that

arose, NQA had to step in and provide its own fix when Jadian failed to perform. Because Jadian breached its contractual support obligations, and because NQA complied with the process set forth in the Escrow Agreement, NQA did not acquire the EQM source code from Iron Mountain by "improper means." Mich. Comp. Laws § 445.1902(b); *accord* 18 U.S.C. § 1839(5). The plain terms of the Escrow Agreement authorized the release. The district court's posttrial findings therefore foreclose Jadian's first misappropriation theory.

Now consider NQA's subsequent use of the source code. Jadian argues that even after a valid release, the Escrow Agreement forbade NQA from using EQM without paying subscription fees. The district court disagreed. It noted that under the heading, "Right to Use Following Release," the Escrow Agreement gave NQA "the right . . . to use the Deposit Material for the sole purpose of continuing the benefits afforded to [it] by the License Agreement." Relying on this provision, the court found that the "plain language" of the Escrow Agreement, as reinforced by "the course of events in this case" and the agreement's "purpose," showed that "NQA was entitled to use the source code" without paying fees "if there was a failure to perform." *Jadian*, 2020 WL 3071756, at *17. We see no reason to disturb the district court's reading on appeal.

Massachusetts law governs the Escrow Agreement here. Under the law of that state, "[w]hen the words of a contract are clear they alone determine the meaning of the contract but, when a contract term is ambiguous, its import is ascertained from the parties' intent as manifested by the [contract]'s terms and the circumstances surrounding its creation." *Merrimack Valley Nat'l Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977). "Determining the existence of a contract ambiguity presents a question of law . . . ." *Bank v. Thermo Elemental Inc.*, 888 N.E.2d 897, 907 (Mass. 2008). But if the contract "has terms that are ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial." *Seaco Ins. Co. v.*

*Barbosa*, 761 N.E.2d 946, 951 (Mass. 2002); *McManus v. McManus*, 35 N.E.3d 745, 750 (Mass. App. Ct. 2015).

Massachusetts considers contract language "ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken." *Bank*, 888 N.E.2d at 907 (quotation marks omitted). And here, there are at least two reasonable constructions of the "Right to Use" provision. On one hand, it could mean—as Jadian claims—that NQA could "continu[e]" using EQM only while undertaking all of an active licensing agreement's burdens, with the advantage that NQA would also have direct access to the source code. On the other hand, the provision might confer on NQA a "right . . . to use" the code "for the sole purpose of continuing *the benefits* afforded" by the licensing agreement, without any concomitant financial burdens. Those "benefits" being the use of the software in order to meet NQA's internal business needs. *See* Michael L. Rustad, 2 Computer Contracts § 8.09[2][c][v] (2021) ("Source code escrow agreements generally provide that the released software may be used by the licensee for the sole purpose of providing maintenance, support, and modifications to the licensed software as required by the licensee for its own internal operations.").

Because the "Right to Use" provision in the Escrow Agreement is ambiguous, we review the district court's assessment of the parties' intent for clear error. *See Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 912 n.14 (Mass. 2017); *Browning-Ferris Indus. v. Casella Waste Mgmt. of Mass.*, 945 N.E.2d 964, 971 (Mass. App. Ct. 2011). The district court found NQA's reading—that following a release, it need not pay fees to use the EQM software—more tenable. We are not left with a definite and firm conviction that this finding was mistaken. *See Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F.3d 533, 537–38 (6th Cir. 2008). The Escrow Agreement contains no explicit language requiring NQA to pay licensing fees following a release of the source code

from Iron Mountain. And other language implies that the parties did not intend such a result. One of the release conditions set forth in the Escrow Agreement was the failure of Enterprises (or Jadian) "to function as a going concern." And it would be absurd to think the parties intended that NQA would be obligated to pay fees to a business no longer in existence. The Escrow Agreement contains no language suggesting that NQA's use rights or obligations would vary based on the particular release condition triggering the Work Request. So we do not see why NQA would need to pay fees based on the triggering event here—Jadian persistently failing at, and then entirely abandoning, its contractual support obligations.

Indeed, the trial testimony reveals that the parties entered into the Escrow Agreement precisely because NQA was worried that Enterprises might not be able to meet its crucial support obligations. Kevin Beard, the President of NQA, explained that the Escrow Agreement was "directly there to protect [NQA's] interests" and was intended to be a "backstop" in case Enterprises (or Jadian) "fail[ed] to be able to service [NQA]." What's more, the record shows that the provision of competent and persistent support was a critical piece of the MSA. Yet, once the source code was released to NQA, Jadian was no longer providing that essential and demanding service; NQA was. And because of this fundamental shift, it is logical that NQA would no longer need to pay the fees set forth in the MSA following a release. *Cf. Nat'l Tax Inst., Inc. v. Topnotch at Stowe Resort & Spa*, 388 F.3d 15, 19 (1st Cir. 2004) ("If one reading [of a contract] produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (e.g., windfall gains, conditions that cannot be satisfied, dubious incentives)."). As the district court summarized:

> Jadian's position, distilled down to its basic understanding, is that it could let NQA
> do the work of providing support to the EQM software, hiring the staff and spending
> the time and resources in order to make things work, sit back for three years, and
> then recover subscription fees for the intervening period. This reasoning recalls to

mind the story of *The Little Red Hen* and enjoys no support either in the language of the MSA, the Escrow Agreement, or the law.

*Jadian*, 2020 WL 3071756, at *17. We do not think the district court's rejection of Jadian's position was clearly erroneous. Thus, the district court's posttrial findings necessarily refute Jadian's alternative misappropriation theory as well.[3]

In short, the district court found that the Escrow Agreement permitted NQA to "use the EQM source code" for itself, "so long as [that use] was within the scope of its business." *Jadian*, 2020 WL 3071756, at *17. That finding was not erroneous. And Jadian points to no evidence suggesting that NQA ever used the code beyond that contractually authorized scope. *See* Mich. Comp. Laws § 445.1902(b)(ii) (providing that "[d]isclosure or use of a trade secret" does not constitute "misappropriation" if done with "express or implied consent"); 18 U.S.C. § 1839(5)(B) (same); *see also Babcock & Wilcox Co. v. Areva NP, Inc*, 788 S.E.2d 237, 260 (Va. 2016) ("There can be no misappropriation where acquisition, disclosure, and use of a trade secret have been expressly authorized by contract.").

---

[3] Although Jadian's briefing is unclear, to the extent it argues that engaging CABEM to provide support services was a breach of the MSA amounting to misappropriation, the district court's posttrial findings refute this theory as well. *See Jadian*, 2020 WL 3071756, at *17 n.9. And we see no error in that regard. The MSA itself permitted NQA to provide access to "Confidential Information" to its "contractors and agents who need such access for purposes consistent with [the MSA] and who have signed confidentiality agreements with [NQA]." Obtaining support services was consistent with NQA's ability to "continu[e] the benefits" afforded to it under the MSA. CABEM signed a confidentiality agreement. And there is no evidence that CABEM worked with the software in any way unrelated to NQA's business operations. In addition, the MSA specifically excluded any information "received from a third party without breach of any obligation owed to [Jadian]" from the definition of "Confidential Information." As explained above, NQA lawfully obtained the EQM source code from Iron Mountain pursuant to the terms of the Escrow Agreement—*i.e.*, without any breach of an obligation owed to Jadian.

Accordingly, any potential error in the district court's grant of summary judgment to NQA on Jadian's trade-secret claims was harmless. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns., Inc.*, 761 F.3d 409, 443 (5th Cir. 2014); *Sell*, 127 F. App'x at 764.

\* \* \*

We AFFIRM.